PORTSIDE INVESTORS, L.P., Asbell
& Associates, L.P. and M.J.
Asbell, Inc., Appellees

v.

NORTHERN INSURANCE COMPANY
OF NEW YORK, Appellants.

Portside Investors, L.P., Asbell
& Associates, L.P. and M.J.
Asbell, Inc., Appellees

v.

Northern Insurance Company
of New York, Appellants.

Portside Investors, L.P., Asbell
& Associates, L.P. & M.J.
Asbell, Inc., Appellants

v.

Northern Insurance Company
of New York, Appellees.

Superior Court of Pennsylvania.

Argued June 21, 2011.

Filed Nov. 23, 2011.

Mark S. Katz, New York, New York, for appellant.

Hugh Hutchinson, Philadelphia, for appellees.

BEFORE: STEVENS, P.J., GANTMAN, and OTT, JJ.

OPINION BY STEVENS, P.J.:

In this appeal from the judgment entered by the Court of Common Pleas of Philadelphia County, Plaintiff/Appellant Portside Investors ("Portside") contends the court sitting as fact-finder in a non-jury trial erred in finding in favor of Defendant/Appellee Northern Insurance Company of New York ("Northern") on Portside's claim that Northern acted in statutory bad faith in investigating and failing to pay on an insurance claim. In the cross-appeal *sub judice*, Defendant/Cross–Appellant Northern, raises several issues from the $1.2 million dollar judgment entered in favor of Plaintiff/Cross–Appellee Portside in a jury trial on a claim of breach of contract. Specifically, Northern maintains the evidence failed to demonstrate that: Portside's collapsed Pier held such value; Portside's valuation expert was qualified to testify as to the Pier's value; the expert articulated a clear formula for determining value in a manner consistent with insurance policy definitions; and, Portside had established Northern was properly estopped from asserting the policy's limitation of suit provision. For the following reasons, we affirm judgment entered in both cases.

The trial court has authored a Pa.R.A.P. 1925(a) opinion that provides an apt factual and procedural history as follows.[1]

In December 2002, Portside commenced this action against Northern claiming breach of contract, breach of the duty of

---

**1.** Supplementation to the trial court opinion appears in brackets.

good faith and fair dealing and statutory bad faith [arising from Northern's denial of a claim for the physical loss of a collapsed pier owned by Portside.]. The trial was bifurcated, with the bad faith claims tried non-jury subsequent to the jury verdict. The contract action was tried before a jury in May 2008. On May 30, 2008, the jury returned a verdict in favor of Portside against Northern. The jury found that Northern breached its contract of insurance with Portside and awarded plaintiff $1,407,859.00 as the Actual Cash Value of the Pier at the time of the collapse.[1] The court reduced the verdict to $1,207,859 to reflect a prior payment of $200,000.00. The bad faith claim was tried non-jury on October 5, 6, and 7, 2009 before this court. Based on the evidence presented, the court appropriately found that defendant's conduct did not amount to bad faith under 42 Pa. C.S.A. § 8371.

------

[1] The jury also found that the plaintiff did not breach its contract of insurance when it failed to file this lawsuit within the two years of the collapse of the Pier.

On June 9, 2008, Defendant filed a motion for post trial relief regarding the jury verdict. On June 30, 2008 Plaintiffs filed an answer in opposition to the motion for post trial relief. Judgment was taken by plaintiff pursuant to Pa. R.Civ.P. 227.4(1)(b) on July 21, 2010. On August 19, 2010 Defendant appealed. In this breach of contract and bad faith action, the Plaintiff Portside Investors, L.P. (hereinafter "Portside") sought compensation for loss for the value of the pier itself, sustained when Pier 34 collapsed. Plaintiff Portside was the owner of Pier 34 on the Delaware River in Philadelphia. The Pier was subject to a triple net lease to HMS Ventures which operated a restaurant facility at the site where the restaurant ship Mosh-

ulu was moored. The principals of HMS Ventures were Michael Asbell and Eli Karetny. HMS and Portside were insured under a first party Property Policy issued by Northern. The Northern policy insured against risks of direct physical loss to the Pier and the building and property in an amount up to $4,300,000.00.

The policy excluded certain causes of loss. Collapse of the pier itself was excluded unless the collapse had been caused by "hidden decay." If caused by "hidden decay," the collapse of the pier itself was a covered loss.

The policy also provided additional coverage including debris removal, demolition expense and business interruption. As to the loss of the pier itself, if covered, the policy provided for [payment of Replacement Cost Value, i.e., the cost to replace the pier with materials of like kind and quality if the pier were to be rebuilt. In the event Portside/HMS elected instead not to rebuild or repair the pier, then the policy entitled it to payment of] "Actual Cash Value." "Actual Cash Value" was specifically defined as replacement cost less depreciation.

On May 18, 2000, a portion of Pier 34 collapsed causing three deaths and numerous injuries. Portside filed an insurance claim with Northern.[2] Portside hired Clark & Cohen/Claims International LLC, a public adjuster, for the loss. Frank Mahoney was designated as the principal adjuster in the Portside claim. Northern hired Stan White of Ocean and Coastal Consultants ("OCC") to investigate the cause of the collapse.

------

[2] HMS also submitted an insurance claim for this loss. Although HMS filed a lawsuit, Northern eventually settled the claim.

On October 19, 2000, Portside submitted a Sworn Proof of Loss seeking in excess

of $15 million. The Sworn Statement identified the cause and origin of the loss as "Hidden Decay." The submission consisted of replacement cost for the building on the Pier, the 200 feet of damaged Pier, debris removal and one year of lost rental income. The submission by Portside did not provide any claimed Actual Cash Value for the pier.[3]

---

[3] Under the policy, replacement cost is only provided if the Pier was actually replaced. If the Pier was not going to be replaced the insured received the Actual Cash Value of the Pier. The Pier was not replaced.

On February 23, 2001, Northern informed Portside that first party property coverage was available under the policy for certain property damage and related business interruption and extra expense resulting from the collapse.[4] Northern proceeded to determine the Actual Cash Value of the Pier since the Pier was not going to be replaced. In April 2001, after a comprehensive professional investigation which included an underwater survey, a review of historical records including soil borings, lab analysis of borings and creation of a model of the Pier and its condition before it collapsed, OCC concluded that the physical structure of the Pier had far exceeded its useful life, had been poorly maintained and was worthless at the time of the loss and therefore had no Actual Cash Value.

---

[4] Portside Exhibit "157".

In July 2001, Northern paid Portside approximately $2.7 million in settlement of many of Portside's claims including the loss of structure on top of the Pier, the costs of debris removal and lost income for one year. Despite concluding that the Actual Cash Value of the Pier was zero, Northern made a payment of $200,000 to Portside for the Pier.

In June 2001, Northern advised Portside as follows:

> Based on a review of the historical documents, as well as an on-site investigation, OCC found the maintenance of the Pier to have been minimal over the course of its almost one-hundred year existence. As the graph reflects, the Pier was well beyond its useful life at the time of it[s] collapse on May 18, 2000. Under these circumstances, we believe the $200,000 ACV proposed for the pier is extremely fair.[6]

[6] Northern Exhibit "311".

On August 16, 2001, Portside informed Northern that it disagreed with the conclusion, methodology employed, and the factual support used to determine the Actual Cash Value of the Pier and demanded an Appraisal under the policy. Notwithstanding Portside's demand for Northern to appoint an appraiser, Portside itself never designated an appraiser. Neither did Portside apply to the court to require Northern to designate or seek Court appointment.

On the very day that Portside demanded an appraisal, a Grand Jury in Philadelphia indicted Michael Asbell and Eli Karetny for involuntary manslaughter and other offenses relating to their conduct in ignoring prior warnings by engineers and others that the pier was unsafe and in danger of imminent collapse.

The Presentation filed in support of the indictment demonstrated that Portside's principal knew about the Pier's decay before the collapse. The Presentation provided:

> The condition of the pier had obviously deteriorated severely by early May 2000. On May 9, 10, 17, and 18, 2000, servicemen from Suburban Propane Company went to Pier 34 on those occasions to replace a pipe that was

leaking gas. The bent pipe had moved and pulled toward the river, and they needed to extend it near the point of the eventual collapse. On May 12, 2000, Eli Karetny notified a carpenter/contractor that he needed him to fill the same crack the carpet installer had filled several months earlier. The contractor arrived with his worker on May 15. The crack was again filled with more concrete.

On May 16, divers from Commerce Construction Company inspected the boat to show him twisted piles that indicated continued pier movement. The divers reported that fill was leaking through the lower deck and some timber piles were leaning outshore. It was also observed on May 16, 2000 that the crack in the top deck, which had just been filled with concrete the previous day, had already reopened again on May 17.

By this time, many employees were expressing concern that the pier would collapse. Jesse Tyson told Michael As[b]ell on May 17, 200 about the diver's observations concerning the condition of the piles. During this conversation, Tyson and Asbell discussed the recent collapse of the South Jersey Port Corporation pier on the Camden side of the Delaware River as an example that old piers become weak and do collapse.

On the morning of May 18, 2000, after discussion with Michael Asbell, Eli Karetny phoned and told his insurance broker that he thought the pier was sinking; the broker then faxed an insurance claim report into the insurance company. Eli Karetny also called and told Jesse Tyson that the filled crack was wider and new cracks had appeared. When Jesse Tyson arrived at the pier in the early afternoon, he noticed that the crack had grown from 3 inches wide on May 16 to 11 inches wide on May 18. Various employees gave varying descriptions of the width of the crack, but all agreed that it had widened significantly by May 18, 2000.

Jesse Tyson told Michael Asbell and Eli Karetny on the early afternoon of May 18 that the pier was in a state of failure and would probably collapse at the next low tide, 8:00 P.M. that night, or the low tide the next morning. Despite this warning, Michael Asbell and Eli Karetny did not close the pier but, instead, opened the club for business that night. . . .[7]

[7] Northern Exhibit "127".

The Commerce Construction Corporation divers' report had made the following finding:

> Area of timber decking have [sic] openings between adjacent members and some decking members show deflection and settlement not bearing on support members allowing granular fill to seep out causing voids and settlement.[8]

[8] Portside Exhibit "75".

Before agreeing to acknowledge receipt, Mr. Asbell had the divers change the findings portion of the report to read:

> Area of timber decking have [sic] openings between adjacent members and some decking members show deflection ~~and settlement not bearing on support members allowing granular fill to seep out causing voids and settlement.~~ ADDITIONAL INSPECTIONS TO FOLLOW (handwritten on document).[9]

[9] Portside Exhibit "76".

[It was Northern's stated belief] that Asbell had important knowledge of the Pier's condition and maintenance. This information, [Northern would maintain

later at trial in defense of Portside's bad faith claim,] would be useful to accurately determine the value of the damaged property and the issue of fortuity. After learning of the indictment, Northern informed Portside that it was reopening its investigation as to both coverage and value of the loss and requested that Mr. Asbell appear for an examination under oath. As was his constitutional right, Mr. Asbell declined to present testimony under oath while criminal charges were pending.

At [jury] trial [on Portside's breach of contract claim], plaintiff [Portside] presented two expert witnesses, Mr. William Castle and [its] public adjuster Mr. Frank E. Mahoney. Mr. Castle testified to the cost to rebuild the pier. He provided no testimony as to its actual cash value as defined by the policy. Only plaintiff's public adjuster expert Mr. Mahoney testified to the Actual Cash Value of the Pier at the time of the loss.

Trial Court Opinion dated 1/13/11 at 1–6.

After verdict in each trial, the trial court issued orders denying Portside's post-trial motions as to its bad faith and breach of contract claims, respectively. The court, however, failed to decide Northern's open post-trial motion challenging the jury's verdict on the breach of contract claim. On July 21, 2010, with Northern's post-trial motion still pending, Portside entered a Praecipe for Entry of Judgment on the jury's verdict plus $700,690 in interest pursuant to Pa.R.C.P. 227.4 (sanctioning entry of judgment on verdict when post-trial motion remains undecided for 120 days). On August 19, 2010, Northern filed Praecipe for Entry of Judgment on the court's judgment on the bad faith claim. Portside's timely appeal and Northern's timely cross-appeal thereafter followed.

## APPEAL OF PORTSIDE

■ In its sole issue on appeal from the judgment entered in the non-jury trial on statutory bad faith, Portside argues that it met its evidentiary burden of proving Northern violated the statute proscribing bad faith claim investigation on the part of an insurer. See 42 Pa.C.S.A. § 8371, *infra*. Specifically argued is that Northern's insistence that it could proceed no further on Portside's claim without an Examination Under Oath ("EUO") of recently indicted Michael Asbell as to his pre-collapse knowledge of Pier 34's underwater decay amounted to a bad faith delay tactic, as there was no reason to believe Asbell could do anything at that point except exercise his 5th Amendment rights throughout the course of his criminal case.

42 Pa.C.S.A. § 8371 provides:
"In an action arising under an insurance policy, if the Court finds that the insurer has acted in bad faith toward the insured, the Court may take all of the following actions

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to a prime rate of interest plus 3%;

(2) Award punitive damages against the insurer;

(3) Assess Court costs and attorneys' fees against the insurer.

42 Pa.C.S.A. § 8371.

After a thorough review of the record, party briefs, and the trial court opinion addressing Portside's appeal, we agree with the cogent rationale expressed by the trial court that Northern's demand was reasonable in the wake of a Grand Jury Presentment that found Michael Asbell knew Pier 34 required considerable maintenance as far back as 1995 and had learned the Pier was in imminent danger

of collapse at least two days before collapse occurred. Under Portside's insurance policy, coverage was unavailable for Pier loss caused by "decay" unless the decay was "hidden decay." As the Presentment, described *supra*, gave reason to believe that Pier 34's collapse resulted from something other than "hidden decay," Northern's decision to insist on a statement from Asbell as to what he knew prior to collapse was not an exercise in statutory bad faith. Accordingly, for the reasons expressed in the trial court opinion dated January 5, 2011, we affirm the judgment entered in favor of defendant Northern Insurance and against plaintiff Portside Investors on Portside's claim for statutory bad faith.

### CROSS–APPEAL OF NORTHERN

■ In its first argument on cross-appeal from a $1.2 million judgment, as molded from the $1.4 million jury verdict in favor of Portside, Northern contends that it is entitled to judgment notwithstanding the verdict regarding the Actual Cash Value (at times hereinafter referred to as "ACV") of the damaged portion of Pier 34 because Portside's expert, insurance adjuster Frank Mahoney, neither was qualified to offer an informed opinion on ACV nor actually offered one at trial. Specifically, Mahoney relied on a method of calculating ACV that was based not on the insurance policy's particular definition of ACV but, instead, on his experience that ACV is the result of "reasonable compromise on value as negotiated by an insurance company and an insured," Northern argues. We find that, while Mahoney indeed made the statements Northern attributes to him, they nevertheless were but part of an extensive body of testimony that, as a whole, unequivocally presented an ACV calculation relying on the equation set forth in the parties' insurance policy.

Our standard of review of a trial court's denial of a motion for judgment notwithstanding the verdict is whether there was sufficient competent evidence to sustain the verdict. Judgment notwithstanding the verdict will be entered only in a clear case where the facts are such that no two reasonable minds could fail to agree that the verdict was improper. An Appellate court will reverse a trial court ruling only if it finds an abuse of discretion or an error of law that controlled the outcome of the case. *Antz v. GAF Materials Corp.*, 719 A.2d 758, 760 (Pa.Super.1998) (internal citations omitted).

Specifically, Mr. Mahoney explained that he headed a team responsible for preparing on behalf of Portside a "Proof of Loss" statement declaring its monetary loss from the collapse of the pier. One member of the team was W.L. Castle, the principal of W.L. Castle Company and an engineer with expertise in piers who was responsible for determining the replacement cost of the lost 200 foot section of Pier 34. Corroborating Mr. Castle's testimony earlier at trial, Mr. Mahoney testified that Mr. Castle reported to him that it would cost Portside $13 million to replace the lost section of Pier 34. As Portside's policy limits were only $4.9 million and a good portion of that amount would be devoted to other necessary expenses (see reference above to $2.7 million paid for other losses), Mr. Mahoney determined that pier replacement would not be possible. He therefore set out to determine the Actual Cash Value of the lost section of Pier. N.T. 5/27/08 at 10–12.

As noted above, all parties agree that the insurance policy in question defines Actual Cash Value as replacement cost less depreciation. Asked to expound on Actual Cash Value, Mr. Mahoney offered the following:

**Q:** Is there some formal text or any resource that you would go to that tells you this is actual cash value?

**MAHONEY:** Essentially, no. It's basically with the experience of people, you have a negotiation and come up with a number. In other words, you don't go to a textbook where it says this is the formula and come out with a number. It's a give and take proposition that you're working with an insurance company or a policyholder.

**Q:** Is there any such thing as a specific number that would be actual—that would be identified on the basis of some objective fact?

**A:** Well, not in this industry, but if you owned a car or a pickup truck, you could go to a blue book or red book and that would give you a general idea of what that vehicle is worth within a three-to-six month time frame as a used vehicle.

**Q:** All right. But how about with regard to a property loss like this?

**A:** It's all a matter of trying to establish—look at the factors and try to establish what a reasonable figure would be.

**Q:** All right. So when you say look at the factors, what factors do you look at, Mr. Mahoney?

**A:** Well, you look at—first you look at the risk, see what it is, and then from that point you look at the age of that risk and from that you look at the activity, and from that you look at obsolescence, and even after that you look at potential defects that may have some value in the judgment of what an actual cash value loss would be.

**Q:** All right. And how are these various factors weighted or used?

**A:** Well, I guess the best way to explain it would be taking those factors and looking at this risk and comparing it with other risks or what other activity was being involved with. The first thing would be age.

**Q:** All right. Tell us—

**A:** It was 90 years old.

**Q:** Tell us about the age and how that would impact on a risk like this.

**A:** Well, a 90–year–old pier obviously is not something that's new, but at the same time it still had an asset value, and by that I mean you look at other piers in the Philadelphia Port and I specifically enumerate Pier 7 at Holt and Pier 6 at South Jersey Port Corp., both being constructed around 1914. This pier was maybe four or five years older than those and they're still going strong handling heavy cargos of steel, plywood, coal, food stuffs. Granted, each individual risk is its own unique situation, but you can get some type of an overview if you know that you have other facilities of like kind and quality the same type of construction and they're still going.

\* \* \*

**Q:** (after Mr. Mahoney attests to his familiarity of other local vintage piers failing because of significant deterioration) Okay, so age is a factor to be considered; is that right?

**A:** Yes.

**Q:** Is it a determining factor?

**A:** No.

**Q:** All right. What's another factor that needs to be addressed?

**A:** Well, the other factor is the condition.

**Q:** And how does that play into determining actual cash value?

**A:** Well, if it's in poor condition, there's going to be much more depreciation applied to the actual cash value situation.

**Q:** And what determines condition?

A: Well, you look at it and you see is this a decrepit pier or whatever the risk might be, does it look like it's a useful risk, is it ready to fall down, is it a derelict. These all go into factoring what you look for when you're trying to establish an ACV.

N.T. at 13–17.

Mr. Mahoney listed more depreciating factors considered in the ACV calculation, including "Activity", "Obsolescence", "Repairs to Defects", and "Components" of the pier itself. The pier was no longer worthy of a heavy industrial use at the time before collapse, Mahoney stated, but it had been "reinvented as a social entertainment center and in that regard it was a very, very active and productive [as in producing revenue] facility." N.T. at 18. The pier was "obsolete" in the strictest sense, according to Mahoney, because it could not have been put to its originally-intended, heavy industrial use without more repair work. This fact alone was not dispositive on fixing depreciation, however, as the pier had proven capable of being put to a newly-intended productive use, namely as an entertainment center. N.T. at 18–19.

The "repairs to defects" depreciating factor in this case was what Mr. Mahoney called a "stabilization factor," or the need to correct defects affecting lateral stability that were first discovered in 1995. Whatever the cost would be to correct the defect causing instability would represent a depreciation deduction from the replacement cost value, Mahoney testified. N.T. at 19–20.

Finally, the "components" of the 20,000 square foot section of pier that collapsed had retained value, Mahoney stated. For example, there were approximately 2,200 pilings—60 to 80 foot long, creosote-covered, telephone pole-sized wood poles—pounded into the soil to where only the top

several feet would be exposed to the air during low water. These pilings "maintain their value throughout," as they tend to be "as good today as it was 80 years ago when it was installed in the river," he stated. N.T. at 20–21. Moreover, 30% of the 200 foot section of pilings that fell did not actually collapse of its own instability, but was pulled in by the adjoining portion of the Pier that suffered from lateral instability, Mahoney testified. N.T. at 26, 28–29.

The eight feet high "fill" used to build up from the low deck under water to the water's surface, upon which is then placed the final macadam surface of the pier was another component that had retained its full value without depreciation, Mahoney stated as he referenced W.L. Castle's $250,000 replacement cost value for this component. N.T. at 22. Another example of a component part retaining its value according to Mahoney was the eight foot high, two foot thick, concrete "sea wall" of the section in question, as it was still holding back water and retaining the fill atop the low deck. N.T. at 23.

Asked if he had ever seen a property loss that had literally depreciated to zero value as Northern's adjuster asserted was the case with Pier 34, Mahoney dismissed the notion entirely, stating his nearly 40 years' experience was that an insurance company does not accept a premium from a policyholder to insure value of a worthless item. N.T. at 24. In his estimation, starting from the replacement cost value of over $13 million supplied by W.L. Castle, Mahoney estimated the Actual Cash Value of the 20,000 square feet in question to be $3.5 million dollars. N.T. at 25. Mahoney's ACV calculation therefore necessarily contemplated $9.5 million dollars'—or over 70%—depreciation.

Mr. Mahoney described Northern's replacement cost estimate of $3.9 million as a

"woefully low" starting point for calculating ACV. He explained that the basis of Northern's ACV estimate was its position that replacement cost of the Pier with materials of like kind and quality would be $195 per square foot. N.T. at 38. In comparison, of the 27 piers Mahoney had previously adjusted—which had all shared Pier 34's configuration of component part, the most contemporary case involving a pier that collapsed independent of any external force was determined to have a replacement cost of $347 a square foot and, after depreciation, an ACV of $300 a square foot. N.T. at 40, 53.[2]

Mahoney then assailed the methodology and conclusions of the two charts Northern had used at trial to illustrate its valuation of Pier 34, asserting that the charts failed to incorporate any of the depreciation factors he had discussed except for age and condition. The first Northern chart gave Pier 34 a negative valuation if one assumes no maintenance was performed, while the other gave a $1.5 million valuation if one assumes the 1995 stabilization efforts constituted maintenance. N.T. at 43. Both charts begin by valuing Pier 34 at $3.9 million Replacement Cost Value before applying depreciation.

Staying on the issue of maintenance, Mahoney took the $350,000 expense incurred in Portside's 1995 stabilization measures and testified that even if, for the sake of argument, the repairs added nothing to Pier longevity, one cannot reasonably conclude that the Pier consequently had no value at all. Instead, the proper depreciation methodology would be to determine what the cost of the necessary repair would be and deduct that from the replacement cost, he said. N.T. at 45. Mahoney then discussed a number of other maintenance measures undertaken by Portside over the previous 15 years that related directly to the depreciation factors he used in valuing the Pier. N.T. at 47.

Cross-examination of Mahoney sought to prove how his lack of training and experience in engineering made him incapable of assessing depreciation of the 20,000 square foot portion of Pier 34 in accordance with the insurance policy's definitions. Northern confronted Mahoney with the report of its engineering expert, Stanley White, who had testified earlier at trial that the 1995 stabilization repairs on the Pier section in question were utterly futile and, accordingly, worthless in abating depreciation of that section. Because the section collapsed just five years later, White opined that the 90 year-old Pier had by the time just before collapse suffered 100% depreciation, outlived its useful life, and, therefore, had an ACV of $0. In stark contrast to Mahoney, who assessed depreciation of the collapsed section within the context of the entire Pier's value,[3] White's depreciation analysis confined itself to the structural integrity of the section that had collapsed.

**2.** The valuation differences between the contemporary case and Pier 34 (according to Northern's opinion) was therefore roughly $3 million in RCV ($347/SF v. $195/SF) and $7 million in ACV ($300/SF vs. $0/SF).

**3.** Northern assails Mahoney's testimony where he asserted that maintenance performed on sections of the pier that did not collapse nevertheless enhanced value to the collapsed section. N.T. at 97–105. Mahoney's opinion in this regard was consistent with his earlier testimony on direct that im-

provements to the Pier that increased both its activity and revenue production served to stem depreciation of the entire Pier. Likewise, Mahoney's heavily scrutinized testimony that, even if futile from an engineering standpoint, the $350,000 of "H pile stabilization repairs" nonetheless enhanced the economic value of the collapsed pier was consistent with his depreciation model that credited increased economic activity and avoidance of obsolescence with abating depreciation.

Contrary to both the argument of Northern and the post-judgment opinion of the trial court, however, Northern's tack never established that Mahoney's ACV/depreciation methodology was unreliable, lacked a foundation in fact, or, most important, conflicted with either accepted industry practice or the insurance policy's specific definition of ACV. Indeed, Mahoney readily admitted that it was his lack of engineering background that prompted him to appoint pier engineer W.L. Castle to first determine Replacement Cost Value, i.e., how much it would cost to replace the collapsed section of Pier 34, so that he could have a reliable starting point from which to then apply depreciation to arrive at ACV. Mahoney's five-part depreciation analysis may have been more inclusive than White's two-part, age-plus-condition analysis, but this fact alone did not render it invalid. At best, cross-examination amplified how Stanley White and Frank Mahoney employed different depreciation models that produced different depreciation percentages for the collapsed Pier, but this record alone simply created an issue of fact over which reasonable minds could disagree. Accordingly, based on a record demonstrating that experienced Pier adjuster Frank Mahoney calculated ACV of the fallen Pier in accordance with the equation of ACV appearing in the insurance policy, we reject Northern's position that it is entitled to judgment notwithstanding the verdict on the issue of Actual Cash Value.

The same rationale upholding both Mahoney's qualifications to adjust a Pier collapse and the suitability of his opinion to assist the jury in its task of deciding ACV also works to defeat Northern's next argument charging error with the denial of Northern's post-trial motion for judgment notwithstanding the verdict based on Frank Mahoney's alleged qualification and testimonial inadequacies.

As in the first issue raised by Northern, resolution of this issue turns on the sufficiency of both Frank Mahoney's general qualifications as an expert in adjusting collapsed piers and his specific expert opinion with respect to assessing the ACV of the collapsed portion of Pier 34 in a manner consistent with the ACV definition provided in the parties' insurance policy. As such, we note that "[t]he admission of expert testimony is a matter of discretion [for] the trial court and will not be remanded, overruled or disturbed unless there was a clear abuse of discretion." *Blicha v. Jacks,* 864 A.2d 1214, 1218 (Pa.Super.2004). In addition:

> [i]t is well-settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. When determining whether a witness is qualified as an expert the court is to examine whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. It is to ascertain whether the proposed witness has sufficient skill, knowledge, or experience in the field at issue as to make it appear that the opinion or inference offered will probably aid the trier of fact in the search for truth.

*Rettger v. UPMC Shadyside,* 991 A.2d 915, 930 (Pa.Super.2010) (citing *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525, 528 (1995)).

Specifically, as was thoroughly explored in the previous issue, Frank Mahoney's nearly 40 years' experience adjusting damaged and collapsed piers along the Delaware River met the standard for qualifying him as an expert at trial on valuation of lost Pier 34. His purported expert opinion as to Pier 34, moreover, expressed an ACV valuation to a reasonable degree of certainty that could serve to assist the finder of fact in determining ACV in accordance

with the insurance policy in question. As such, the trial court properly denied Northern's post trial motion for judgment notwithstanding the verdict.[4]

■ Finally, Northern presents several issues involving the two-year suit limitation period provided in the policy of insurance it issued to Portside. Specifically, the policy contained a suit limitation provision stating that no insured may bring legal action against Northern under the policy unless: (1) the insured has complied with all terms of the "Coverage" part; and (2) the action is brought within two years after the date on which direct physical loss or damage occurred. It is undisputed that the December 6, 2002 date on which Portside commenced the breach of contract action against Northern was more than two years after the May 18, 2000 collapse in question.

The procedural history of the case shows that Northern filed pretrial, trial, and post trial motions on this issue, including two motions for summary judgment, one motion for compulsory nonsuit, and one motion for judgment notwithstanding the verdict. Each motion argued Portside had failed to make the necessary showing for that phase of the litigation that Northern was estopped from invoking the policy's suit limitation provision. In each instance, the trial court denied the motion.

The well-established standard of review of an order granting or denying a motion for summary judgment is as follows:

We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Abrams v. Pneumo Abex Corp.*, 602 Pa. 627, 634–35, 981 A.2d 198, 203 (2009).

■ Our standard of review for a Motion for Compulsory Nonsuit is as follows:

A motion for compulsory non-suit allows a defendant to test the sufficiency of a [plaintiff's] evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury.

---

4. For the reasons herein expressed, we deny Northern's motion before this Court seeking remand of the present matter to permit the trial court, which has authored a Pa.R.A.P. 1925(a) opinion representing a change of opinion on the adequacy of Frank Mahoney's ACV testimony, to effectively grant Northern's post-trial motions seeking judgment notwithstanding the verdict. The trial court, however, is without jurisdiction over the case *sub judice*, and we respectfully disagree with the considered opinion expressed by the trial court on the adequacy of Mahoney's expert opinion. Accordingly, we deny Northern's motion for remand and, by necessity, grant Portside's motion to deny Northern's motion for remand.

*Reading Radio Inc. v. Fink,* 833 A.2d 199, 209–210 (Pa.Super.2003). (internal citation omitted). Our standard for judgment notwithstanding the verdict appears above, *See Antz, supra,* and need not be repeated.

Specifically, as to each motion, Portside raised two defenses whereby it maintained that preclusion of the contractual time bar was required. First, Portside argued that Northern engaged in a bad faith insistence that no settlement could obtain without indicted owner Michael Asbell first submitting to an Examination Under Oath as to whether he had been advised of the Pier's decay before collapse and, if so, of what degree of decay was he aware. Because Northside could reasonably expect no other response from Asbell other than to exercise his 5th Amendment rights, Northern was engaging in a bad faith attempt to delay negotiating the claim, Portside maintained. As noted above in our decision, however, we dismiss this argument, as obtaining Asbell's statement under oath was a reasonable part of Northern's investigation into whether the Pier decay in question was actually "hidden decay" unknown to Asbell before collapse.

Portside's second defense to invocation of the time bar, that Northern later advised Portside it would conduct a policy-mandated appraisal after Michael Asbell submitted to an EUO, has merit, as Northern's communication implied that it would continue to consider Portside's claim with-

out regard to the suit limitation clause; "[we will] revisit the appraisal demand after the examinations [of Asbell] are complete." Letter of Philip C. Silverberg, counsel for Northern, dated October 22, 2001.[5] Evidence of this correspondence was part of the record at the time each motion for judgment was filed. As Asbell had only recently been indicted and Northern could expect him to exercise his 5th Amendment rights throughout his criminal prosecution, Northern's statement is reasonably read as a willingness to resume action of the claim after Asbell's criminal trial, regardless of the policy time-bar. Accordingly, we uphold each trial court order denying Northern's various motions seeking judgment or compulsory nonsuit under the policy's suit limitation clause.[6]

In its remaining issue, Northern alleges that the trial court erred in awarding prejudgment interest on the verdict, molded by the court to reflect a prior $200,000 payment on the claim, of $1.2 million. Specifically, Northern contends that Portside caused several delays in moving forward on its claim by: deferring suit until almost 14 months after Northern refused to pay on the claim without an EUO of Michael Asbell; obtaining a stay of two years and eight months to accommodate criminal proceedings against Michael Asbell; and waiting another 11 months to resume discovery after the stay

---

5. Northern argues Portside could not have relied on this statement because Michael Asbell testified he was unaware of this letter. Nevertheless, the finder of fact could reasonably determine based on other testimony that Asbell had delegated to his legal/insurance team all responsibility in handling Portside's claim with Northern.

6. A good portion of Northern's argument in favor of judgment notwithstanding the verdict is that Portside did not follow through with its threat to sue if Northern failed to pay Portside

$1.5 million for the collapsed portion of the Pier by October 26, 2001, a date six months prior to the 2 year limitations date. While Portside thereby expressed an ultimatum in negotiations with Northern, it was certainly not bound to act on it to the exclusion of all other communications made between the parties. As noted above, Northern had indicated to the Portside team, without condition, that it would consider appraisal under the policy after Asbell submitted to an examination under oath.

was lifted despite correspondence from Northern seeking such resumption.

▮ It is well-settled that in contract cases, prejudgment interest is awardable as of right. *Somerset Comm. Hospital v. Allan B. Mitchell & Assocs.*, 454 Pa.Super. 188, 685 A.2d 141 (1996) (citing *Thomas H. Ross Inc. v. Seigfreid*, 405 Pa.Super. 558, 592 A.2d 1353 (1991)). On this point, the Pennsylvania Supreme Court has held that the "right to interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment." *Fernandez v. Levin*, 519 Pa. 375, 380, 548 A.2d 1191, 1193 (1988). "The basic premise underlying the award of prejudgment interest to a party centers on the fact that the breaching party has deprived the injured party of using interest accrued on money which was rightfully due and owing to the injured party." *Widmer Engineering, Inc. v. Dufalla*, 837 A.2d 459, 469 (Pa.Super.2003). *See also* Restatement (Second) of Contracts § 354 (1979) (providing interest for breach of contract from time payment under contract is due less all deductions to which party in breach is entitled).

It is well established[, however,] that a party who suffers a loss due to the breach of a contract has the duty to make reasonable efforts to mitigate his losses. *Bafile v. Borough of Muncy*, 527 Pa. 25, 588 A.2d 462 (1991) (citations omitted). The burden to prove this duty to mitigate is placed on the party who actually breaches the contract; the breaching party must show how further loss could have been avoided through the reasonable efforts of the injured party. *Pontiere v. James Dinert, Inc.*, 426 Pa.Super. 576, 627 A.2d 1204 (1993). An injured party, however, is not obligated to mitigate damages when both it and the liable party have an equal opportunity to reduce damages. *Loyal Christian*

*Ben. Ass'n v. Bender*, 342 Pa.Super. 614, 493 A.2d 760 (1985).

*Somerset Comm. Hosp., supra* at 204–205.

Northern directs our attention to those parts of the record showing Portside caused delays in taking six months to file its proof of loss claim, fourteen months to file suit after Northern's insistence on Asbell's EUO, a two years and eight month stay to accommodate criminal proceedings against Asbell, and eleven more months thereafter to resume litigation on the present claim. Of these alleged delays attributable to Portside, only the final one comprising eleven months, several letters by Northern, and, finally, a court order granting Northern's motion compelling production of discovery appears to have been the avoidable product of lack of diligence, as Portside failed to make reasonable efforts to acquire new counsel upon prior counsel's death. Moreover, Northern appears to have met its burden to mitigate the delay by both contacting Portside immediately about resumption of discovery and filing a motion with the court when no definitive answer from Portside was forthcoming. *See id.* Accordingly, we remand solely for the recalculation of prejudgment interest, which shall not include the time from the date on which Portside's stay was lifted until the time the trial court entered its June 25, 2007 order compelling Portside to produce discovery responses.

For the foregoing reasons, therefore, we affirm judgment entered in favor of Northern and against Portside following nonjury trial on Portside's claim of statutory bad faith, and we affirm judgment entered in favor of Portside and against Northern following jury trial on Portside's claim of breach of contract in all respects except for the application of prejudgment interest, which shall require remand for recalculation in a manner consistent with the above decision. Northern's motion for re-

mand on the basis of the trial court's Pa. R.A.P. 1925(a) opinion is denied.

GANTMAN, J. Concurs In Result.