J-A12007-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CAMAY E. WILLIAMS, ADMINISTRATRIX OF THE ESTATE OF MARCEL MACKEY, SR., DEC'D | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| WILLOW TERRACE AND ALBERT EINSTEIN MEDICAL CENTER; ALBERT EINSTEIN HEALTHCARE NETWORK; METHODIST HOSPITAL; THOMAS JEFFERSON UNIVERSITY HOSPITALS; ST. AGNES CONTINUING CARE CENTER; ST. AGNES LONG TERM CARE, LLP; MERCY HEALTH SYSTEM; HAHNEMANN UNIVERSITY HOSPITAL; TENET HEALTHSYSTEM HAHNEMANN, LLC | : | |
| APPEAL OF:  WILLOW TERRACE AND ALBERT EINSTEIN HEALTHCARE NETWORK | : | No. 2856 EDA 2012 |

Appeal from the Judgment Entered August 27, 2012,
In the Court of Common Pleas of Philadelphia County,
Civil Division, at No. 03774, March Term, 2009.

BEFORE:  SHOGAN, STABILE and PLATT*, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JULY 31, 2014**

Appellants, Willow Terrace and Albert Einstein Healthcare Network, appeal from the judgment entered on August 27, 2012, in the Philadelphia County Court of Common Pleas.  We affirm.

In its opinion, the trial court set forth the relevant facts and procedural history of this matter as follows:

_____
*Retired Senior Judge assigned to the Superior Court.

This case is a wrongful death and survival action under 42 Pa.C.S.A. §§ 8301, 8302, brought by the Plaintiff, Camay Williams, administratrix of the estate of Marcel Mackey (herein, Appellee), who died after being cared for by the Defendants Willow Terrace and Albert Einstein Health Network (herein, Appellants). The procedural history of the case is as follows:

The suit was initiated by the Appellee in the Court of Common Pleas, Philadelphia County, Civil Division, March, 2009 (No. 03774). While it is impossible to adequately summarize a complaint of over 100 pages, in general, the Appellee alleged that the various health care providers were negligent in their care and treatment of the decedent, Marcel Mackey [("Decedent")], thereby causing him harm. At the time of trial there were 10 named Defendants: Willow Terrace; Albert Einstein Medical Center; Albert Einstein Health Network; Methodist Hospital; Thomas Jefferson University Hospitals; St. Agnes Continuing Care Center; St. Agnes Long Term Care, LLP; Mercy Health System; Hahnemann University Hospital; and Tenet Health System Hahnemann, LCC.[1]

> [1] Following a jury verdict against Willow Terrace and Albert Einstein Healthcare Network, the caption was amended by the Court at the request of the parties found not liable on June 20, 2012.

The testimony revealed that the decedent was born on October 8, 1939. He had a medical history of bilateral above the knee amputations, diabetes mellitus, multiple strokes, transient ischemic attacks, Bells Palsy, dementia, depression, hypertension, incontinence, anemia, peripheral vascular disease, and malabsorption. On March 3, 2007, at the age of 67 the decedent was admitted to Hahnemann University Hospital having not felt well for four to five days. His immediate complaints consisted of thirst and incontinence. Medical records indicate that the decedent had decreased movement on the right side resulting in a diagnosis of left middle cerebral artery stroke with aphasia. Moreover, a Percutaneous Endoscopic Gastrostomy (PEG) tube was placed as the decedent could not swallow or eat. His chart reveals right pneumothorax, aspiration pneumonia, and episodes of diabetic ketoacidosis. Lab work on March 20, 2007 indicated an albumin level of 1.8, indicating protein malnutrition.

Finally, during the decedent's stay at Hahnemann University Hospital, he developed a stage II pressure ulcer on his sacrum.

On March 21, 2007, the decedent was transferred to St. Agnes Long Term Acute Care Hospital. His medical charts show total right hemiparesis as well an MRSA infection pseudomonas on the stage II ulcer. Treatment for the ulcer consisted of debridement and IV antibiotics. The decedent also received occupational therapy, speech pathology, consultation from a dietician, NPH insulin, antidepressants, and dietary supplements. On April 23, 2007, the decedent was transferred to St. Agnes Skilled Nursing Facility where he received a similar course of treatment. During this time his prealbumin levels were on a downward trend and his albumin levels were not within normal limits.

On May 11, 2007, the decedent entered Methodist Hospital. He had an elevated white blood cell count of more than 30,000, acute incident of sepsis, hypertension, dehydration, protein malnutrition, a UTI, as well as right upper and middle lobe aspiration pneumonia. Likewise, his sacral decubitus ulcer continued to be a problem. The decedent was deemed stable for discharge on June 4, 2007. While his family expressed an interest in taking the decedent home, they did not appear for training and directed the hospital to transfer the decedent to Willow Terrace, a skilled nursing facility.

From June 4, 2007 to January 29, 2008, the decedent was a resident of Willow Terrace, with several brief admissions to Albert Einstein Medical Center.[2] From January 29, 2008 to March 6, 2008, he remained at Albert Einstein Medical Center. While under the care of the Albert Einstein Healthcare Network, the decedent's chart reveals dehydration, protein malnutrition, recurrent aspiration with sequelae of aspiration pneumonia, the worsening of the pressure ulcers to the sacrum, poor hygiene, and infections.

[2] Willow Terrace was under the control of Albert Einstein Medical Center, a tertiary acute care hospital. Both of these facilities are part of the Albert Einstein Health Network.

The decedent was transferred to Montgomery Hospital on March 6, 2008 where he remained until his death on May 5, 2008. His death certificate lists the immediate cause of death as a severe end stage decubitus ulcer, skin breakdown, sepsis, failure to thrive, and metabolic encephalopathy. Other factors listed were hypertension and ventilator dependant [sic] respiratory failure.

The Appellee argued at trial that the originally 10 named Defendants were substandard in: care, staffing, assessments, oversight, and administration. Other than Methodist Hospital and Thomas Jefferson University Hospital, the jury found that all originally named Defendants were negligent in the care and treatment of the decedent. On August 12, 2011, the jury found that only Willow Terrace (80%) and Albert Einstein Healthcare Network (20%) were the factual cause of harm. The jury awarded $1,500,000 in wrongful death damages (as well as $287,601 in stipulated past medical expenses under the Wrongful Death Act) and $500,000 under the survival damages. 42 Pa.C.S.A. §§ 8301, 8302. Likewise, the jury found that the conduct of Willow Terrace and Albert Einstein Healthcare Network was "willful or wanton, or exhibited reckless indifference to the rights of the decedent."

On September 21, 2011, the jury awarded $400,000 in punitive damages against Willow Terrace and $100,000 in punitive damages against Albert Einstein Healthcare Network. On June 20, 2012, … the Appellant's Motions for a New Trial or Judgment Notwithstanding the Verdict were Denied by this Court. That same day, the Appellee's "Precautionary Post Trial Motion" was marked as moot as the Appellant's Post Trial Motions were denied. By Order docketed on August 7, 2012, this Court found that Delay Damages were warranted in the amount of $114,000. As a result, the verdict was molded to $2,901,602 by the Honorable Sandra M. Moss on August 21, 2012 to reflect the above amounts.[3] Judgment on the molded verdict was entered by the Appellee on August 27, 2012. Both parties appealed that Entry of Judgment.

[3] The Honorable Sandra M. Moss handled the matter during a brief period in which this writer was not certified as a Senior Judge.

-4-

On September 19, 2012, the Appellants filed a notice of appeal to the Superior Court under 2856 EDA 2012, while on October 1, 2012 the Appellee filed a notice of appeal under 2857 EDA 2012.[4] These Cross Appeals were consolidated by the Superior Court.

> [4] The Appellee's 1925(b) Statement refers to this as a "Precautionary Appeal"[.]

Trial Court Opinion, 4/8/13, at 1-4.[1]

In this appeal, Appellants raise eight issues for this Court's consideration:

1. Is not the factual record in this case, in the context of Plaintiff's decedent's significant health issues, so devoid of evidence of outrageousness as to justify granting a judgment notwithstanding the verdict on the issue of Punitive Damages?

2. Is not the weight of the evidence of outrageousness, in light of Plaintiff's decedent's significant health problems, such that Defendants are entitled to a new trial limited to the issue of punitive damages?

3. Did not the Trial Court commit reversible error warranting the grant of a new trial when it precluded Defendants from informing the jury that they are not-for-profit entities but permitted Plaintiff repeatedly to refer to them as "healthcare conglomerates" and "massive companies"?

4. Did not the Trial Court commit reversible error warranting the grant of a new trial when it excluded Defendants' nursing expert from the courtroom during the testimony of Plaintiff's similarly qualified expert?

---

[1] Appellee's untimely cross-appeal at 2857 EDA 2012 was voluntarily discontinued on January 30, 2014.

5. Did not the Trial Court commit reversible error warranting the grant of a new trial when it permitted Plaintiff's experts to testify that certain conduct was reckless and outrageous?

6. Did not the Trial Court commit reversible error warranting the grant of a new trial when it precluded Defendants' expert, Dr. Robert Perkel, from testifying as to the standard of care for the treatment of pressure ulcers?

7. Did not the Trial Court commit reversible error warranting the grant of a new trial when it permitted Plaintiff's nursing expert to offer her opinions as to Plaintiff's exposure to an increased risk of suffering certain further medical injuries?

8. Did not the Trial Court commit reversible error warranting a molded verdict when it included a stipulated figure for medical specials on the Verdict Sheet along with a blank line for Wrongful Death damages, then permitted a double recovery by adding the stipulated figure to the amount awarded by the jury on the Wrongful Death line to get the total Wrongful Death damages?

Appellants' Brief at 6-8.

In the argument portion of their brief, Appellants present their first and second issues as one issue, and likewise, we will address it as such.[2]

---

[2] We direct Appellant's attention to Pa.R.A.P. 2119, which addresses the requirements for the argument section of appellate briefs and provides, in relevant part, as follows:

**Rule 2119. Argument**

**(a) General rule.** The argument shall be divided into as many parts as there are questions to be argued[.]

Pa.R.A.P. 2119(a). "The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." *Estate of Haiko v. McGinley*, 799 A.2d 155, 161 (Pa. Super. 2002). Here, Appellants' Statement of Questions Presented lists their issues as numbers one through eight. Appellants' Brief at 6-8. However, in the argument portion of their brief, issues one and two

Appellants' claim that the trial court erred in denying a motion for judgment notwithstanding the verdict ("JNOV") on the issue of punitive damages or alternatively that they are entitled to a new trial on punitive damages.  Our standard of review is as follows:

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

**Buckley v. Exodus Transit & Storage Corp.**, 744 A.2d 298, 304-305 (Pa. Super. 1999) (internal citations omitted).

Punitive damages are appropriate only in cases of outrageous behavior, where the defendant's egregious conduct shows either an evil

---

from the Statement of Questions Presented are combined into argument section A, and the remaining issues are set forth in argument sections B through G.  Appellants' Brief at 20-69.  While inconsistent and in violation of Rule 2119, Appellants' combination of issues and alteration from numbers to letters presents a confusing format but does not hamper appellate review, and we shall proceed with our discussion.

motive or reckless indifference to the rights of others. *J.J. DeLuca Co., Inc. v. Toll Naval Associates*, 56 A.3d 402, 415 (Pa. Super. 2012). Punitive damages are appropriate when the defendant's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct. *Id*. at 415-416. The determination of whether actions rise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court as long as that discretion has not been abused. *Id*. at 416. The state of mind of the tortfeasor is vital, and the act, or the failure to act, must be intentional, reckless, or malicious. *Feld v. Merriam*, 485 A.2d 742, 748 (Pa. 1984). A defendant acts recklessly when his conduct creates an unreasonable risk of physical harm to another and such risk is substantially greater than that which is necessary to make his conduct negligent. *Hall v. Episcopal Long Term Care*, 54 A.3d 381, 395 (Pa. Super. 2012). Therefore, a showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed. *Id*. "Rather, the plaintiff must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to intentional, willful, wanton or reckless conduct." *Id*.

Additionally:

> [a] new trial based on weight of the evidence issues will not be
> granted unless the verdict is so contrary to the evidence as to

shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the jury, and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion. Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion.

***Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.***, 77 A.3d 1, 8 (Pa. Super. 2013).

In their brief, Appellants set forth in detail the evidentiary record and testimony in this matter. They claim that none of the evidence offered by Appellee established outrageous conduct and that they are entitled to a new trial on the issue of punitive damages. Appellants' Brief at 28-42.[3] We disagree.

The record reflects that many of Appellants' employees and former employees were called to testify, and their testimony established a

---

[3] Appellants argue that the deficiencies in Decedent's medical charts support the possible conclusion that Decedent may have been repositioned in his bed but the repositioning was not placed in his medical chart. Appellants' Brief at 29. We reiterate that we do not review the record in the light most favorable to Appellants, but rather to Appellee as verdict winner. ***Buckley***, 744 A.2d at 304-305. As will be discussed below, there was ample evidence that Appellants were more than merely negligent in their care of Decedent. Decedent's wounds became increasingly more severe and resulted in his death, and Appellants' failure to make a notation in the chart was only a portion of the evidence presented.

consistent theme and pattern revealing outrageous conduct. The trial court

noted as follows:

> Here, the Appellee called numerous employees of Willow Terrace and Albert Einstein Healthcare Network. Sharron Tull, [a Certified Nursing Assistant ("CNA") and] former employee of Willow Terrace testified that dependant [sic] patients such as the decedent should be turned every two hours and that the repositioning should be recorded. N.T. 7/21/11 at 127-138. Ms. Tull went on to testify that there were portions of the decedent's chart which were completely void of any notation of repositioning. N.T. 7/21/11 at 143-146. Specifically, there were 33 eight hour shifts in August of 2007 in which there are no notations of repositioning. N.T. 7/21/11 at 144-146. Ms. Tull explained that she would complain of understaffing and that she would be pulled off of her floor without replacement. N.T. 7/21/11 at 148. Moreover, even with all staff present, it wasn't possible to reposition patients every two hours. N.T. 7/21/11 at 149. Finally, Ms. Tull testified that when State Inspectors visited Willow Terrace the nurses were notified and there was always more staff present. N.T. 7/21/11 at 151.
>
> Next the Appellee called Gail Clark, [a Licensed Practical Nurse ("LPN")], another former employee of Willow Terrace. Ms. [Clark] testified that the decedent appeared to be in a lot of pain and that his ulcer was "so bad [it was] unstagable." N.T. 7/21/11 at 174.[4] She described the ulcer as the size of a "place plate" and that it was infected, with a foul smell, and pus drainage. N.T. 7/21/11 at 177-180. Ms. Clark echoed that it was known that the decedent had to be repositioned every two hours or his wound worsen[ed]. N.T. 7/21/11 at 181. At Willow Terrace she was responsible for 30 patients a shift and would receive complaints from nursing aids and patient's families that there was not enough help. N.T. 7/21/11 at 185-188. Like Ms. Tull, Ms. Clark testified that when the State Inspectors came to Willow Terrace there would be more staff present. N.T. 7/21/11

---

[4] Ms. Clark also testified that wounds are graded in terms of stages of severity, *i.e.*, Stage I, II, III, and IV. N.T., 7/21/11, at 174. Ms. Clark testified that Decedent's wound was so severe that it did not fit within the aforementioned stages. ***Id***.

at 193. When it came to wound care, Ms. Clark testified that when she would change the decedent's bandages, that it was evident the bandages were not be[ing] changed every shift as ordered by the doctor. N.T. 7/21/11 at 196.

Zenobia Teel, [Registered Nurse ("RN")], formerly a Director of Nursing at Willow Terrace also testified that residents, families, and nurses complained of understaffing. N.T. 7/22/11 at 46. Ms. Teel testified that Range of Motion was required twice a day for the decedent, but it only happened three times total on the 3pm-11pm shift from July 1, 2007 to July 23, 2007. N.T. 7/22/11 at 71. Moreover, during the month of July, the decedent was documented as being repositioned only six times during the 3pm-11pm shift. N.T. 7/22/11 at 73-74. The decedent's Willow Terrace chart shows he was repositioned on October 23, 2007 and October 24, 2007 though, at that time he was at Albert Einstein Medical Center, not Willow Terrace. Ms. Teel agreed that there were incomplete chart entries revealing a lack of catheter care, showers, and skin assessments for the decedent. N.T. 7/22/11 at 81-84. Finally Ms. Teel detailed numerous deficiency citations Willow Terrace received from State Inspectors. N.T. 7/22/11 at 90-105.

Miriam Medina, RN, another former employee of Willow Terrance[,] echoed complaints concerning understaffing, elaborating that they couldn't get everything done with four CNAs on the floor; at times one CNA would be pulled leaving only three. N.T. 7/22/11 at 158-162. She also testified that whenever State Inspectors were present there … was more staff. N.T. 7/22/11 at 162. Randy Crowder, a former Administrator of Willow Terrace testified that Willow Terrace received a citation from State Inspectors on May 17, 2007 for failing to follow doctor's orders; the decedent arrived one month after the citation. N.T. 7/25/11 at 25-26.

The Appellee also called Marquella White, RN, a former Restorative Manager at Willow Terrace as a hostile witness. N.T. 7/25/11 at 60. After cross-examination, she recalled testifying during her deposition that nurses, residents, as well as resident's families complained of understaffing. Ms. White admitted that she passed those complaints onto the Director of Nursing, Ms. Teel. N.T. 7/25/11 at 72-74.

Beth Ann Lopresti, [Nurse Practitioner ("NP")], worked for Mobile Wound Consultants and visited Willow Terrace. N.T. 7/25/11 at 87-90. With the assistance of the decedent's charts Ms. Lopresti detailed how his ulcer got progressively worse from June 20, 2007 to January 23, 2008. N.T. 7/25/11 at 108-158. Specifically, the ulcer was 3.8 cm x 5.1 cm with a depth of 1 mm on June 20, 2007. N.T. 7/25/11 at 108. At each assessment, the wound was bigger, while more purple, black, and/or brown tissue had developed; this included a foul odor, infection, and yellow exude. N.T. 7/25/11 at 117-123. On November 28, 2007 she found a new wound at the base of his penis. N.T. 7/25/11 at 152. On December 12, 2007 the ulcer was 23cm x 21cm with a depth of 3cm, she noted that "Sacral wound continues with copious drainage and foul odor. Wound continues to deteriorate and increase in size. Debridement, large amount of loose, foul smelling slough, with sterile scissors." N.T. 7/25/11 at 154-156. At her last assessment, on January 23, 2008, the ulcer had grown from 3.8 cm x 5.1 cm to 25cm x 28cm with a depth of more than 4.5cm. N.T. 7/25/11 at 158.

The Appellee also called Dr. Loren Lipson who was accepted by this Court as an expert in Geriatrics; Geriatric Medicine; Diabetes; Internal Medicine; Long-Term and Nursing Home Care; Nutrition; and Federal and State Regulations Applicable to Nursing Homes. N.T. 7/26/11 at 17-19. Dr. Lipson testified that in his opinion both Willow Terrace and Albert Einstein Medical Center were "woefully below the standard of care". N.T. 7/27/11 at 53. Dr. Lipson also interpreted the Death Certificate, explaining that the ulcer, the ulcer's infection, failure to thrive, and delirium were the cause of death. Moreover, he opined that Willow Terrace and Albert Einstein Medical Center were the facilities which played a substantial role in the death of the decedent. N.T. 7/27/11 at 54-56.

Finally, Suzanne Frederick, RN, testified as an expert in nursing standards of care in hospitals, nursing homes, and home administration. She testified that Willow Terrace failed to assess and treat the decedent's pain, even though doctors had ordered premedication. N.T. 8/01/2011 at 93-98. In her review of the records she found that the real failure of Willow Terrace was the lack of turning and repositioning as well as lack of Foley catheter

maintenance and range of motion tests. N.T. 8/01/2011 at 111-112. Ms. Frederick opined that repositioning is basic nursing care which was simply being ignored along with auditing their records and charts; not doing either was reckless and outrageous. N.T. 8/01/2011 at 22. Also outrageous was the fact that charts were filled out for the decedent at Willow Terrace while he was at Albert Einstein Medical Center. N.T. 8/01/2011 at 126. Likewise, she testified that there appeared to be a lack of communication and supervision in regards to the worsening wound. N.T. 8/01/2011 at 135-136. Finally Ms. Frederick clarified that the various state and federal surveys (or deficiency notices) put Willow Terrace on notice that they were not meeting the standard of care. N.T. 8/02/2011 at 124.

Trial Court Opinion, 4/8/13, at 6-10 (footnote added).

Upon review, we conclude that the record reveals that Appellants were aware of the pervasive and routines failure at their facilities. Appellants' facilities were chronically and continuously understaffed; however, when the facilities had notice of governmental inspections, they instead provided appropriate staff levels. Decedent was routinely not repositioned, and Decedent's medical charts were so faulty they revealed that he was allegedly repositioned at times when he was not even present at the facility. The understaffing and failure to reposition Decedent, despite his increasingly severe wounds, which were known to Appellants, caused his death. This is not a scenario where there was an instance of negligence or even gross negligence; rather, it was a definite and clear pattern of callous, wanton, and reckless action and inaction. *See Hall*, 54 A.3d at 397 (stating that a decedent's estate established outrageous conduct sufficient to permit an

award of punitive damages where the evidence showed the nursing home was chronically understaffed, the nursing home was aware of the understaffing which led to improper patient care, and the nursing home deliberately increased staff during times of state inspections and then reduced staff levels after the inspection was concluded). Therefore, we discern no error in the presentment of punitive damages to the jury and no error or abuse of discretion in the trial court's denial of Appellants' motion for JNOV. Moreover, nothing in the award of punitive damages shocks our sense of justice. As set forth above, there was ample evidence supporting the award of punitive damages. We conclude that the trial court did not abuse its discretion in upholding the jury's verdict, and we will not substitute our judgment for that of the jury.

In each of the remaining issues, Appellants assert that the trial court should have granted a new trial based on claims that it made erroneous evidentiary rulings. As noted above, in reviewing a trial court's denial of a motion for a new trial generally, our standard is narrow, and we will reverse the decision of the trial court only if we find an abuse of discretion or an error of law that controlled the outcome of the case. **Keystone Dedicated Logistics, LLC**, 77 A.3d at 8. A trial court's rulings on the admissibility of evidence are left to the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law.

***Hutchinson v. Penske Truck Leasing Co.***, 876 A.2d 978, 984 (Pa. Super. 2005). Moreover, to constitute reversible error, the evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. ***McClain v. Welker***, 761 A.2d 155, 156 (Pa. Super. 2000) (citation omitted).

Appellants argue that the trial court erred in precluding them from informing the jury that they are non-profit organizations while permitting Appellee to refer to Appellants as "healthcare conglomerates" and "massive companies." Appellants' Brief at 42. We discern no error.

Here, Appellee presented the trial court with a motion *in limine* to preclude Appellants from introducing their non-profit status during the liability phase of trial. N.T., 7/20/11, at 21. The trial court granted the motion concluding that Appellants' status as a non-profit entity was irrelevant and would only serve to confuse the jury. ***Id***. The trial court pointed out that at the liability stage of the trial, when determining negligence, the issue as to whether a defendant is for-profit or non-profit is irrelevant. ***Id***. at 20. As noted above, the admissibility of evidence is left to the discretion of the trial court, and upon review, we discern no abuse of that discretion.

Moreover, with respect to Appellants' claims that the trial court erred in allowing Appellee to refer to Appellants as "healthcare conglomerates" and

"massive companies," we conclude that there was no objection to Appellee's use of these terms in the record. It is well settled that in order to preserve a claim of error for appellate review, a party must make a specific objection to the alleged error before the trial court in a timely fashion and at the appropriate stage of the proceedings. *Law Office of Douglas T. Harris, Esquire v. Philadelphia Waterfront Partners, LP*, 957 A.2d 1223, 1229 (Pa. Super. 2008) (citations omitted). "Failure to raise such an objection results in waiver of the underlying issue." *Id*. (citations omitted). Accordingly, because Appellants failed to object, the issue is waived.

Next, Appellants claim that the trial court erred when it excluded Appellants' nursing expert from the courtroom during Appellee's expert's testimony. We disagree.

This Court will not disturb a trial court's ruling on the sequestration of witnesses absent an abuse of discretion. *Commonwealth v. Stevenson*, 894 A.2d 759, 767 (Pa. Super. 2006) (citation omitted). "Moreover, an appellant must demonstrate that he or she was actually prejudiced by a trial judge's sequestration order before any relief may be warranted." *Id*. (citation omitted); *see also In re Adoption of J.F.*, 572 A.2d 223, 225 (Pa. Super. 1990) (concluding that the trial court did not err in refusing to sequester a witness where there was no prejudice to the appellant).

Here, the record reflects that Appellee, prior to presenting the testimony of her expert witness, Suzanne Frederick, RN, asked the trial court to excuse Appellants' expert from the courtroom pursuant to an earlier sequestration order, and the trial court directed that Appellants' expert was sequestered. N.T., 8/1/11, at 5-6. While Appellants now argue that they are unable to locate a sequestration order in the record, they have not directed this Court's attention to the place in the record where they objected to their witness being sequestered.[5] As noted above, when a party fails to object at trial, the issue is waived on appeal.[6] *Law Office of Douglas T. Harris, Esquire*, 957 A.2d at 1229.

---

[5] In their brief, Appellants' assert that there was some confusion as to whether the trial court had in fact previously ordered sequestration of all witnesses. Appellants' Brief at 46. However, it is undisputed that the trial court did specifically order Appellants' nursing expert out of the courtroom while Appellee's nursing expert testified. N.T., 8/1/11, at 5-6. The record reflects that Appellants made no objection to this ruling. *Id*.

[6] Assuming for the sake of argument that Appellants had lodged a timely and specific objection preserving this issue for appellate review, no relief would be due because Appellants failed to establish prejudice. *Stevenson*; *In re Adoption of J.F.* In their brief, Appellants merely claim that, had their expert not been sequestered, she could have assisted in preparing for cross-examination. Appellants' Brief at 48. Appellants have offered only this bald assertion, but without any substance as to what testimony the expert could have assisted regarding cross-examination or how Appellants were prejudiced without their expert's aid, this argument is completely speculative and fails to establish prejudice.

Next, Appellants claim that the trial court erred when it permitted Appellee's experts to testify that certain conduct was reckless and outrageous. We conclude that no relief is due.

Here, Appellants argue that reckless or outrageous conduct is not outside the ken of laypersons, and therefore, expert testimony on the issues of recklessness or outrageousness was error. Appellants' Brief at 50. Upon review, we are constrained to point out that nowhere in their appellate brief do Appellants cite to the record or otherwise set forth what testimony should have been precluded. Appellants neither quoted from the transcript nor directed this Court to the place in the record where the allegedly improper testimony could be found. It is well settled that it is not the responsibility of this Court to develop an argument for the appellant, and we shall not scour the record to find evidence to support an argument. ***J.J. DeLuca Co., Inc.***, 56 A.3d at 411. Accordingly, we conclude that this issue is waived. ***Id***.

In their sixth issue, Appellants argue that the trial court erred in precluding Appellants' expert, Dr. Robert Perkel, from testifying regarding the medical treatment of, and standard of care for the management of, pressure ulcers. No relief is due.

The admission of expert testimony is left to the discretion of the trial court, and the trial court's ruling will not be disturbed unless there was a clear abuse of that discretion. ***Portside Investors, L.P. v. Northern Ins.***

*Co. of New York*, 41 A.3d 1, 12 (Pa. Super. 2011) (citation omitted).

Additionally:

> it is well-settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. When determining whether a witness is qualified as an expert the court is to examine whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. It is to ascertain whether the proposed witness has sufficient skill, knowledge, or experience in the field at issue as to make it appear that the opinion or inference offered will probably aid the trier of fact in the search for truth.

*Id*. (citations omitted).

At the outset, the ruling the trial court made with respect to Dr. Perkel's qualifications was as follows:

> (Sidebar conference)
>
> **THE COURT:** To the defense, I am not quite certain why he is here.
>
> **[Counsel for Appellants] MR. SABO:** He is going to testify, Your Honor, as to the risk factors for [Decedent's] pressure ulcer, as well as how his comorbidities affected the development and the course of his pressure ulcers.
>
> **[Counsel for Appellee] MR. GIGLIONE:** That's why I asked to approach, Your Honor.
>
> To the extent he is being called to offer any opinions of the standard of care at Willow Terrace, or any of the practice done at Willow Terrace as it related to [Decedent], I am going to object.
>
> This witness is not qualified to give opinions as to a nursing home whatsoever.
>
> This man never worked in a nursing home, has never overseen a nursing home.

It's not appropriate for him to give standards of care, such as Willow Terrace.

**MR. SABO:** He did testify earlier in his career he did work in a nursing home.

He has treated patients in his practice who have come from nursing homes and go back to nursing homes, and he is familiar with accepted standards of medicine. And that is what he is here to testify to.

Your Honor, I think it was pretty clear through his recitation of his medical career, he is more than qualified to give testimony concerning the medical issues in this case.

**THE COURT:** How is that going to relate to [Decedent]?

**MR. SABO:** Well, it's going to relate to [Decedent] because we are not just going to look at him in a vacuum, we are looking at him with what risk factors he had prior to his major stroke in 2007 and the result of his stroke, and also how the risk factors and the comorbidities all play out to the progression of this wound.

**MR. GIGLIONE:** Your Honor, the regulations as they relate to nursing homes were amended in 1987.

He testified outside of the report in this particular case.

He has no knowledge of the Federal regulations relating to facts, such as Willow Terrace.

It's inappropriate to allow this witness to come in and talk about what was or was not done in Willow Terrace. He has no experience.

I can't give testimony about whether or not a doctor was negligent in a case because I have no experience in that field.

**MR. SABO:** He's also here to testify on behalf of Albert Einstein Health Care Center, Albert Einstein Healthcare Network. And he

offers an opinion on how the comorbidities of [Decedent] played a role in his life expectancy.

**MR. GIGLIONE:** I agree he is qualified to testify about what happens in the hospital. I have no problem with that.

My criticism —

**THE COURT:** I am going to qualify him as an expert; however, I will limit his testimony to his field of expertise, not his understanding of what's done at a medical center or a nursing home.

Is that clear?

**MR. SABO:** With regard to the medical setting, he does work at a medical center.

**THE COURT:** His testimony as to how the operation of a nursing home, he's in a medical center because he's used to that, but he's not qualified to testify as to the standard of care in a nursing home.

**MR. SABO:** Your Honor, he is not going to testify as to the administrative responsibilities of the nursing home, but what he is expected to testify to is that the care and treatment rendered to [Decedent] in the nursing home was within the accepted standard of care.

**THE COURT:** How does he know that?

Where does that come from, his expertise?

**MR. SABO:** Because of his lengthy career of practicing medicine, treating these types of patients, and knowing the effects of the comorbidities and the medical conditions on the human body, and how -- looking at these records from Mr. Mackey, how the progression of the wound correlates to his comorbidities and the progression of the wound.

**THE COURT:** That much is fine; however, he is not qualified to talk about the standard of care in a nursing home because he

has no experience there, what happens in a nursing home, specifically Willow Terrace.

He can say as to the hospital, but not as to the nursing home.

**MR. SABO:** Your Honor, I would like to take an exception on the record, because he does have experience treating these types of patients.

He did —

**THE COURT:** I will permit that. I will permit that, but I will not permit the testimony as to his expertise as to nursing home care standard of care in a nursing home. That's too broad.

**MR. GIGLIONE:** He also cites in his report studies about the life expectancy when someone gets a feeding tube being a certain percentage;

He cites to somebody with dementia has a certain period of time.

**MR. SABO:** He —

**MR. GIGLIONE:** In generating this report, he throws out statistics. That's all he does. It has nothing to do with [Decedent's] care.

**MR. SABO:** Your Honor, what he has done is he has read the evidence based on medical literature concerning tube feedings, strokes, and other maladies.

**THE COURT:** I will permit that.

(End of Sidebar Conference)

---

**MR. GIGLIONE:** Your Honor, at this time —

**THE COURT:** I find that Dr. Perkel is an expert in the area in which he presents himself.

N.T., 8/4/11, at 106-111. No further objections or discussion occurred on the topic of Dr. Perkel's qualifications. Thus, the focus on Dr. Perkel's qualifications and the issue debated at sidebar raised the question of whether Dr. Perkel could testify as to the standard of care in a nursing facility. During this inquiry, Appellants never mentioned the standard of care for pressure ulcer care. Additionally, as evidenced in the quoted material above, Dr. Perkel was not specifically precluded from testifying as to the standard of care for pressure ulcers, but only as to standard of care for a nursing home. N.T., 8/4/11, at 109.

Moreover, while Appellants challenge the trial court's ruling with respect to Dr. Perkel's qualifications, we must point out that Dr. Perkel did in fact testify regarding pressure ulcers and their care more than twenty-five times during direct and cross-examination. N.T., 8/4/11, at 120-180. Dr. Perkel testified about staging pressure ulcers, surgical debridement of pressure ulcers, prognosis, body positioning, body repositioning, and the frequency with which a patient should be repositioned to avoid causing and aggravating pressure ulcers. *Id*.

Upon review of Appellants' brief, we conclude that Appellants' argument fails to illustrate what testimony was precluded by virtue of the

trial court's ruling and in what way, if any, they were prejudiced. Accordingly, we discern no abuse of discretion in the court's ruling.

Next, Appellants claim the trial court committed reversible error warranting the grant of a new trial when it permitted Appellee's nursing expert to offer her opinions beyond her qualifications. Appellants' Brief at 59. We disagree.

Appellants cite to the notes of testimony and challenge the trial court's rulings with respect to portions of Nurse Frederick's testimony. Appellants claim that Nurse Frederick testified beyond her qualifications when she discussed the interplay between the conduct of the nurses and Decedent's nutritional status and overall condition and prognosis. Appellants' Brief at 60 (citing the reproduced record at 669 and 672 (citing N.T., 8/1/11, at 87-88, 97, 100-101)).[7] Upon review, however, there is no objection to the testimony Nurse Frederick provided on pages 87-88, 97, or 100-101. Accordingly, these challenges were not preserved for appeal. *Law Office of Douglas T. Harris, Esquire*, 957 A.2d at 1229.

---

[7] We note that there is an incongruity between Appellants' brief and the reproduced record. Appellants argue that the allegedly improper testimony was given by Nurse Frederick, and Appellants cite to the reproduced record at pages 669 and 672, which are supposed to contain pages 87-88, and 97 of the notes of testimony from August 1, 2011. Appellants' Brief at 60. However, pages 669 and 672 in Appellants' reproduced record are not from Nurse Frederick's testimony on August 1, 2011. Rather they are from Dr. Loren Lipson's testimony on July 28, 2011. Nevertheless, the notes of testimony from August 1, 2001, appear in the certified record, and this error does not hamper our appellate review.

Appellant next objects to Nurse Frederick testifying "as to a causal nexus between inadequate Foley catheter care and various consequences, including urinary tract infections, and about having contractures, even though she never offered any testimony about specialized training or experience with Foley catheters or contractures." Appellants' Brief at 61 (internal citations to the record omitted). However, once again, this issue was not preserved for review.

Upon review of the portion of the record where Appellants claim the error occurred, there is no objection made with respect to Nurse Frederick's testimony concerning Foley catheters. The only objections were in response to Appellee's counsel asking Nurse Frederick if failures in care were reckless and outrageous. N.T., 8/1/11, at 112. Accordingly, Appellants' challenge to the testimony concerning Nurse Frederick's testimony on catheters was not preserved for appeal. ***Law Office of Douglas T. Harris, Esquire***, 957 A.2d at 1229.

In their final issue on appeal, Appellants claim the trial court erred when it included a stipulated figure for past medical expenses on the verdict sheet along with an empty line for the entry of wrongful death damages, permitting a double recovery by adding a stipulated figure to the amount awarded by the jury for wrongful death damages. We disagree.

The record reveals that the trial court instructed the jury relative to awarding damages under the Wrongful Death Act and Survival Act damages as follows:

> [Appellee], as the administratrix of the decedent's estate, claims damages under the Wrongful Death Act and the Survival Act.
>
> She is entitled to make a claim under both Acts, but the damages must not be duplicative.
>
> If your verdict is in favor of [Appellee], you must then find the amount of money damages that you believe fairly and adequately compensate [Appellee] as the administratrix of the decedent's estate, for all the physical injuries, and the financial damages sustained as a result of the negligence you found.
>
> The amount you award today must completely compensate the [Appellee] on behalf of the decedent's estate for all damages sustained in the past, as well as all damages you find will also be sustained in the future.
>
> The verdict sheet you will receive when you begin your deliberations contains a series of questions that will lead you to a proper verdict.
>
> There are places for you to record your verdict as to each item of damages. I will now describe that for you.
>
> Under the Wrongful Death Act, the damages recoverable by [Appellee] are as follows:
>
> Past medical expenses:
>
> The Plaintiff is entitled to be compensated in the amount of all past medical expenses reasonably incurred for the diagnosis and treatment of his injuries in the past.

These expenses, as alleged by [Appellee], are in the amount of $287,601, as indicated on the Jury Interrogatory Sheet. This verdict should be recorded as a single amount.

[Appellee] is entitled to be awarded a sum that would fairly and adequately compensate his family for the monetary value of the services, society, and comfort that he would have given to his family had he lived, including such elements as work around the home, provision of physical comfort and services, and provision of society and comfort.

Under the Survival Act, the damages recoverable by [Appellee] are as follows:

[Appellee] is entitled to be awarded an amount that you believe will fairly and adequately compensate him for the mental and physical pain, suffering, and inconvenience, and loss of life's pleasures that the decedent endured from the moment of his injury to the moment of his death as a result of this incident.

There are four items that make up a damage award for non-economic losses.

One: Pain and suffering;

Two: Embarrassment and humiliation;

Three: Loss of ability to enjoy the pleasures of life, and;

Four: Disfigurement.

[Appellee], on behalf of the decedent's estate, is entitled to be fairly and adequately compensated for all physical pain, mental anguish, discomfort, inconvenience, and distress that you find that the decedent endured from the time [of] the injury until the time of his death.

[Appellee], on behalf of the decedent's estate, is entitled to be fairly and adequately compensated for such embarrassment and humiliation that you believe the decedent had endured as a result of his injuries.

[Appellee], on behalf of the decedent's estate, is entitled to be for [sic] fairly and adequately compensated for the decedent's loss of his ability to enjoy any of the pleasures of life as a result of the injuries from the time of those injuries until the time of his death.

Finally, the Plaintiff, on behalf of the decedent's estate, is entitled to be fairly and adequately compensated for the disfigurement that the decedent suffered from the time of the injury until the time of his death.

You are to add each of these sums of damages together in their proper categories and return your verdict in two lump sum amounts; one under the Wrongful Death Act, and the second under the Survival Act.

N.T., 8/8/11, at 192-196.

The verdict sheet provided empty lines for the jury to enter the amount of wrongful death and survival damages, but the line for past medical expenses was filled in to reflect the stipulated amount of $287,601. The verdict slip is reproduced in relevant part as follows:

**Question #4.** State the amount of damages sustained by [Decedent] and/or the Estate of [Decedent], as a result of the negligence of [Appellants].

Wrongful Death: _____

Past Medial Expenses Under Wrongful Death Act: $287,601

Survival damages: _____

Verdict Slip, 8/12/11, at unnumbered 4.

When the jury completed its deliberations, it filled out the verdict sheet as illustrated below:

**Question #4.** State the amount of damages sustained by [Decedent] and/or the Estate of [Decedent], as a result of the negligence of [Appellants].

Wrongful Death: $1,500,000.00[8]

Past Medical Expenses Under Wrongful Death Act: $287,601

Survival damages: $500,000.00[9]

Completed Verdict Slip, 8/12/11, at unnumbered 4 (footnotes added).

Appellants claim that there was error because the $1.5 million for wrongful death that the jury entered on the "Wrongful Death" line should include the stipulated amount for past medical expenses of $287,601.00. Appellants Brief at 68. Thus, Appellants argue that the verdict was actually $2,000,000.00 and not $2,287,601.00. *Id*. We conclude that Appellants are entitled to no relief.

Prior to the verdict being recorded and while the jury was still empanelled, there was a discussion at side-bar as to how the verdict sheet should be interpreted. N.T., 8/12/11, at 50-52. Counsel for Appellants argued that the verdict should be a total award of $2,000,000.00, while Appellee averred the total was $2,287,601.00. Nowhere in the record is there a request for clarification despite the jury remaining empanelled.

---

[8] Handwritten amount.

[9] Handwritten amount.

In **Picca v. Kriner**, 645 A.2d 868 (Pa. Super. 1994), in determining whether the trial court was correct in granting the appellant a new trial, this Court concluded that there was a question as to what the jury intended by the way it completed its verdict slip. This Court concluded that an ambiguity in the verdict that created a question as to the jury's intention that could have been clarified prior to the jury being discharged was waived where the appellant failed to pursue that option. **Picca**, 645 A.2d at 871.

Upon review, it appears that the jury sought to award $1,500,000.00 in wrongful death damages over and above the $287,601.00 in stipulated past medical expenses. However, because Appellants failed to challenge or clarify this interpretation in court before the verdict was entered and the jury was dismissed, the issue is waived on appeal. **Picca**, 645 A.2d at 871.

For the reasons set forth above, we conclude that Appellants are entitled to no relief on appeal. Accordingly, we affirm the judgment entered on August 27, 2012.

Judgment affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/2014

-30-