J-A04042-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LARRY GLENN, D/B/A LARRY GLENN CONSTRUCTION | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 578 MDA 2017 |
| ANDREA H. SMITH | : | |
| | : | |
| v. | : | |
| | : | |
| BRIDGET GLENN D/B/A LARRY GLENN CONSTRUCTION | : | |

Appeal from the Judgment Entered March 17, 2017
In the Court of Common Pleas of Clinton County Civil Division at No(s):
126-14

| | | |
|---|---|---|
| LARRY GLENN, D/B/A LARRY GLENN CONSTRUCTION | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDREA H. SMITH | : | |
| | : | No. 659 MDA 2017 |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| BRIDGET GLENN D/B/A LARRY GLENN CONSTRUCTION | : | |

J-A04042-18

Appeal from the Judgment Entered March 17, 2017
In the Court of Common Pleas of Clinton County Civil Division at No(s):
126-14

BEFORE:   STABILE, J., NICHOLS, J., and RANSOM*, J.

MEMORANDUM BY RANSOM, J.:                **FILED JUNE 25, 2018**

Larry Glenn d/b/a Larry Glenn Construction ("Contractor") and Andrea H. Smith ("Homeowner") both appeal from the judgment entered on March 17, 2017.  We affirm Contractor's liability to Homeowner, that Bridget Glenn ("Bridget") has no liability to Homeowner, and that Homeowner has no liability to Contractor, but we vacate the judgment and remand for a new hearing limited to the issue of damages.

In early 2012, Homeowner approached Contractor about building a home.  In April 2012, Contractor and Homeowner signed a document entitled "Contractor Agreement – LARRY GLENN CONSTRUCTION" ("Contract").  According to the terms of the Contract, Contractor would charge Homeowner for "time, materials and 10% profit."

Contractor started construction in June 2012 and completed it in October 2012.  Contractor provided invoices to Homeowner throughout the construction, each one noting the hours of labor as follows:  June – 556 hours; July - 1,065.5 hours; August – 660.5 hours; September – 673 hours; and October – 242 hours.  Pl.'s Ex. 3 (collectively).

Contractor also performed landscaping pursuant to a subsequent oral

_____
*   Retired Senior Judge assigned to the Superior Court.

- 2 -

agreement. Prior to the completion of the home, Homeowner requested additions of a finished basement and an outside deck. These embellishments were not included in the Contract.

Upon moving into the home in November 2012, Homeowner discovered that the roof leaked. Trial Court Opinion (TCO), 10/5/16, at 2, 5. Upon further investigation, she learned that the gutters also leaked at the seams, were not pitched properly, and did not drain and that the trim at the garage doors was water-damaged and loose. After uncovering these problems, Homeowner refused to pay the balance under the Contract.

In February 2014, Contractor filed a complaint against Homeowner for breach of contract and unjust enrichment, in order to collect the unpaid balance. In March 2014, Homeowner filed an answer and counterclaim for breach of contract, unjust enrichment, and violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). For her breach of contract claim, Homeowner alleged that Contractor's performance was not "in a good and workmanlike manner" and was not in compliance with the Contract. Answer with New Matter & Countercl., 3/3/14, at ¶¶ 64, 84. For the UPTCPL claim, Homeowner contended that Contractor engaged in unfair or deceptive acts or practices by "represent[ing] that services are of a particular standard, quality or grade [when] they [were] of another" and engaging in other "fraudulent or deceptive conduct and thereby creating the likelihood of confusion or misunderstanding," specifically by "greatly inflating the costs under the [C]ontract." *Id.* at ¶¶ 95-96, 105 (citing 73 P.S. § 201-

2(4)(vii), (xxi)). Homeowner simultaneously filed a complaint to join additional defendant, Bridget, raising the same three counts.

In March 2014, Contractor filed preliminary objections to Homeowner's counterclaim. In his preliminary objections, Contractor contended that Homeowner's counterclaim under the UTPCPL was precluded by the "gist of the action" doctrine.[1] The trial court agreed with Contractor, stating that "[t]he UTPCPL is clearly a social policy determination by the legislature imposing sanctions for fraud or, since recent amendments [in 1996], 'deceptive' conduct." Order, 5/16/14, at 3. In May 2014, the trial court thus sustained the Contractor's preliminary objection and dismissed "all references in [Homeowner]'s pleading to the UTPCPL[.]" *Id.* at 5. In June 2014, Homeowner filed an amended new matter and counterclaim, in which she stated: "Upon information and belief, [Contractor] greatly inflated the costs under the [Contract] by misrepresenting the rate being paid to employees and by charging a 10% profit on this inflated rate and on materials purchased by

_____

[1]    The gist of the action doctrine bars a plaintiff from re-casting ordinary breach of contract claims into tort claims. . . .

Although they derive from a common origin, distinct differences between civil actions for tort and contract breach have developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.

*Knight v. Springfield Hyundai*, 81 A.3d 940, 950 (Pa. Super. 2013) (internal citations and quotation marks omitted) (some formatting).

[Homeowner] for her own home."  Am. New Matter & Countercl., 6/3/14, at ¶ 61.

In July and November 2014, some repairs were completed on the home. TCO, 10/5/16, at 4.  These repairs included caulking around windows and exterior sealing.  The total cost of these repairs was $1,876.30.

During a bench trial, Homeowner presented the report and expert testimony of a building inspector, Kevin R. Crane.  Ex. Smith-21 (Crane's expert report; HouseMaster Report ID:  CEIKC7900); Notes of Testimony (N.T.), 7/27/16, at 15-49.  Crane testified about problems with various components of Homeowner's house.  He explained the ratings system that he and other inspectors use, including that any element of a building rated as "poor" "requires immediate attention." *Id.* at 12.

Crane began by testifying that the gutters installed by Contractor leaked, were not set to the proper pitch to allow gravity to drain the water downwards, and were installed with non-copper screws at the seams, which are likely to corrode.  *Id.* at 17-19.  He explained that the "water is standing in the gutter and it's not draining" and that "it has to be changed."  In his opinion, the gutters rated as "poor" and "needed to be addressed." *Id.*; *see also* Ex. Smith-21 at 6, 20 ¶ 1.3 (rating gutters as "poor"; "[g]utters will require repairs to function properly").

Next, Crane testified that the entry doors had "a poor fit and finish." N.T., 7/27/16, at 22-23. Although he rated them as "fair" instead of "poor," he explained that, here "[f]air means that the element was functional, but

there are certain things about it that may require or will require repair." His report recommended that a "qualified contractor should be consulted to determine remedial action[.]" Ex. Smith-21 at 8.

He continued that the stone of the front stoop was crumbling. N.T., 7/27/16, at 24. His report observed that the "[b]roken stone should be repaired to avoid hazards and injury." Ex. Smith-21 at 8.

Crane testified that trim around the garage door is wood, which was installed in such a way that it touched the ground and was therefore affected by runoff water and snow. *Id.* at 9, 21 ¶ 2.8; N.T., 7/27/16, at 32; TCO, 10/5/16, at 5. Crane rated the trim work as poor and stated that it should be replaced with an appropriate material.

Additionally, he stated that the crown molding was cracking, warping, and separating from the walls and ceilings on the first floor. N.T., 7/27/16, at 38, 40 ("a pretty significant amount of separation"). His report described the ceilings as "sub-standard" and offered two possible methods of repairing the existing conditions. Ex. Smith-21 at 14-15. The report also asserted that the problems with the ceilings and walls could have been prevented if the contractor had "secure[d] the interior partitions to the trusses with truss clips" with nails that were "not driven tight to allow for movement of the truss."

He also testified that the staircase and its railing were not secure, rated them as "poor," and stated that they "needed to be addressed." N.T., 7/27/16, at 44-45; Ex. Smith-21 at 15-16, 23 ¶ 5.4 (rating stairs and railings as "poor").

He further testified that several of the windows installed by Contractor were pushed out of their frames, were not properly mounted, and were "not installed properly." N.T., 7/27/16, at 19, 45-48. He pointed to the problems with the rear bedroom window as the most egregious and rated it as "poor." *Id.* at 22, 46, 48. He also knew that there were problems with a window used for displaying crackle glass but could not recall the specifics. *Id.* at 48. Overall, he rated the windows as "poor," "because there's so many issues with them. It really requires someone to go in and correct them." *Id.* at 46, 48; *see also id.* at 46 ("you're going to need someone to come in and correct them"); Ex. Smith-21 at 8, 20 ¶ 2.1, 23 ¶ 5.5 (rating windows as "poor"). He also noted that the trim wrap around the windows was loose, with some of it completely detached. *Id.* at 8, 20 ¶ 2.1. He explained that the trim at the sliding joint above windows and doors and the horizontal trim "must be kept sealed to minimize leakage or decay." *Id.* at 20 ¶ 2.1. He made no observations about the color of the trim.

Finally, at the conclusion of direct examination, Crane agreed that any aspect of the home that he rated as "poor" needed to be addressed by a qualified individual. N.T., 7/27/16, at 48.[2] The following exchange occurred:

> **Q** And, sir, were your opinions given today given within a reasonable degree of certainty within your industry, that is, the home inspection industry?
>
> **A** Yes.

---

[2] In his report, Crane also rated the deck as "poor." Ex. Smith-22 at 8, 21 ¶ 2.4.

*Id.* at 48-49.

Homeowner also presented the expert testimony of another contractor, Craig Hoover, to establish the amount of her damages. On February 9, 2015, Hoover had sent a letter to Homeowner detailing numerous repairs for her residence ("the Hoover Estimate"). Ex. Smith-22. The Hoover Estimate does not opine as to why these proposed repairs are needed.

The Hoover Estimate listed fourteen separate projects. Ex. Smith-22 at 1-2. The first two were for work on areas that had been repaired since the date of the Hoover Estimate – specifically, for "[e]xterior caulking around the perimeter of the windows, at the intersection of the stucco-plaster, to seal out weather infiltration" and for the removal and installation of "a new triple window unit in the living room," and their exact cost was known. *Id.* at 1 ¶¶ 1-2. The other items were as follows:

> 3.     To remove casing from eleven (11) archway sides and four (4) trimmed windows with rounded head pieces then purchase new casings to blend with the existing home. All casings will be of the same design, matching heads and sides at the miter[ joints] . . .
>
> 4.     To remove all existing crown molding throughout the home and re-install them using a backer board for stability and jointing. We will replace with new where needed, glue all joints and cope all interior corners. On the second floor I propose to install a "wallboard" around the perimeter of the walls, at the ceiling line. This board will be painted the same as the crown [moldings]. We will then install the crown [moldings] . . .
>
> 5.     [To] remove the existing Bluestone from the front stoop and replace it with a new thicker stone . . .
>
> 6.     . . . [T]o completely remove the existing staircase, leading to the second floor . . .

7. . . . [T]o remove and install a new back bedroom window. This window does not close properly . . .

8. . . . [To] adjust and re-align the front doors along the center "T" astragal to make a complete seal around the perimeter . . .

9. . . . [To] replace the existing exterior window trim, on the rear deck with a color that matches the rest of the home. . . .

10. . . . [To] remove the existing [medium density fiberboard] trim from the perimeter of the garage doors and replace it with [AZEK[3]] exterior trim boards . . .

11. . . . [T]o support the existing rear deck off the kitchen. The deck cannot be fixed without the use of posts, without extreme, extensive measures. . . .

12. . . . [T]o remove the existing long window that houses the owner's crackle glass collection and replace it with a special order Andersen window. . . .

13. . . . [To] purchase and install a new bathroom fan for ventilation of the basement bathroom. . . .

14. . . . [To] remove all aluminum zip screws that were used during installation of the copper gutters and secure all joints with solder as described by Larry Clark, of C & L Roofing and Sheet Metal. Some replacement of gutter may need to be done to insure a clean solder joint along with cleaning of the copper. This will result in shinny copper areas for about six to nine months.

*Id.* at 1-2. "Two items on the Hoover [E]stimate (No. 11 exterior deck and No. 13 bathroom fan) . . . were additions/charges not in the [Contract] and were requested by [Homeowner] after the house was substantially constructed and under roof." TCO, 10/5/16, at 6. Homeowner did not sign the Hoover Estimate and presented no evidence that she intended to do so.

---

[3] AZEK is a brand of building products. Hoover testified that AZEK board "is basically a composite type board that can be milled like any other board, but resists rot." N. T., 7/28/16, afternoon session, at 27.

During trial, Hoover testified about some of the specific items listed on the Hoover Estimate. For Item No. 5, he stated that he did not plan to do the stone work himself, and, instead, the cost of that project on the Hoover Estimate "was based on an estimated cost from [his] mason as a subcontractor. [The mason] had given [Hoover] a cost on that." N.T., 7/28/16, afternoon session ("p.m."), at 22.

For Item No. 7, when asked if the existing window could be salvaged and re-used, thereby eliminating the need to purchase a new window, Hoover answered, "I really hope so. I think so." *Id.* at 35. When then asked how much could be saved if a new window were not needed, Hoover replied, "$800, maybe." *Id.*

When asked how many hours were needed for Item No. 8, Hoover responded that he did not know. *Id.* at 35.

The cost on the Hoover Estimate for Item No. 14 was also from a subcontractor, Larry Clark of C & L Roofing and Sheet Metal; however, Hoover testified that he added "probably" ten percent to the figure provided by Clark when drafting the Hoover Estimate. *Id.* at 32-33, 37-38. Clark did not testify, and no report by Clark was offered into evidence at trial.

Hoover testified that, in general, he did not separate any labor charge from materials. *Id.* at 34. He also did not have his notes with him at trial. *Id.* The following exchange concluded Hoover's direct examination:

> **Q** And Mr. Hoover, the opinions that you've given today, did you give them within a reasonable degree of certainty within the construction industry?

**A**     Yes.

*Id.* at 33.

Contractor and Bridget also both testified.  Contractor testified that he began his construction business in 1972 as a sole proprietor and married Bridget in 1995; she began working for his business sometime thereafter but had no ownership interest in the business.  N.T., 7/27/16, at 4.  Bridget testified that she would sign checks and sign for mail addressed to Contractor. *Id.* at 67, 76.  Bridget further testified that, after Homeowner had begun occupying her home, Bridget prepared a document dated May 23, 2013, for Homeowner to sign agreeing to $1,000 monthly payments on the unpaid balance for the construction and subsequent landscaping agreement, which Homeowner never signed.  *Id.* at 67-68.  The heading of the document stated: "Larry Glenn and his wife, Bridget Glenn, d/b/a Larry Glenn Construction."

Following trial, in October 2016, the trial court entered a verdict in the amount of $28,174.96 for Homeowner's "refund due under [Contractor]'s claim," TCO, 10/5/16, at 4, and entered a verdict on Homeowner's counterclaim in favor of Homeowner in the amount of $32,931.30.[4]  The

---

[4] The trial court calculated that Homeowner should have been charged $329,501.87 by Contractor for construction of her home, but Homeowner had already paid Contractor $370,750.53.  TCO, 10/5/16, at 3.  The trial court thus computed that Homeowner was entitled to a refund of $41,248.66.  *Id.* The trial court also found that Homeowner separately owed Contractor $13,073.70 for landscaping.  *Id.* at 4.  The trial court thus concluded that Homeowner's refund due under Contractor's claim should be reduced to $28,174.96.  *Id.*

combined verdict in favor of Homeowner and against Contractor therefore was $61,106.26. When the trial court calculated these amounts, it did not include Item No. 11 and 13 in the Hoover Estimate, and it used an hourly rate for Contractor's labor of $16.00, which was the amount Contractor paid his employees per hour, and not the $35.00 per hour rate identified in his invoices. The trial court also declared that Contractor's wife, Bridget, did not have any ownership interest in Contractor's business and thus had no liability for the claims raised by Homeowner.

Both Contractor and Homeowner filed post-trial motions. Homeowner asked, in part, to amend her complaint to reinstate the UTPCPL claims, alleging Contractor had engaged in "fraudulent or deceptive conduct creating the likelihood of confusion or misunderstanding" by "greatly inflat[ing] the rate he was charging[.]" Homeowner's Mot. for Post-trial Relief, 10/13/16, at 3 ¶¶ 19, 26.[5]

In March 2017, the trial court denied all post-trial motions, except for acknowledging that it had miscalculated the damages for Homeowner's counterclaim:

---

[5] Paragraph 19 of Homeowner's motion for post-trial relief cites to 73 P.S. § 201-2(4)(vii) but employs the language of the "catchall" provision of § 201-2(4)(xxi). We believe that the citation to Subsection (4)(vii) was a typographical error and will consider Homeowner's challenge pursuant to Subsection (4)(xxi) to be preserved for appeal.

[The trial c]ourt erroneously added Items 1 and 2 on the Hoover [Estimate] to the total damage figure. This was in error because the [c]ourt did not intend to award those two items as damages. . . . [D]amages were being awarded on the Hoover [E]stimate[] for Items 3 through 8, 12, and 14. . . . The award on [Homeowner]'s counterclaim should have been $26,936.25 plus $1,055.00 for Items 9 and 10 which were addressed separately.[6] In addition, the [c]ourt awarded $1,876.30 for repaired damages. The total counterclaim award should have been $29,867.55.

TCO, 3/6/17, at 3-4. In other words, the trial court had inadvertently included the first two projects listed on the Hoover Estimate twice in the total – once for the estimate and once for the exact amount. The trial court agreed that the inclusion of the cost of these two items for a second time was in error. The trial court therefore ultimately awarded damages for the actual costs of the exterior caulking around the perimeter of the windows, the removal of the existing window in the living room, and the installation of a new living room window (all of which had been completed) plus the uncompleted projects listed as Item No. 3 to 8, 12, and 14 in the Hoover Estimate. Ex. Smith-22 at 1-2; TCO, 10/5/16, at 6-7. Thus, the trial court awarded damages for the repair of the crown molding, the stoop, the front doors, the garage door trim, the gutters, and the windows; the repairs for the windows included caulking, replacement of some exterior trim, removal and replacement of casing for

_____

[6] The trial court explained that Item No. 9 and Item No. 10 "are minor in the estimate (relatively speaking) and will be accepted as reasonable. They total $1,055.00 and will be accepted." TCO, 10/5/16, at 6. In its brief to this Court, Appellant incorrectly states that these two items were "not awarded by Court" and therefore does not challenge their inclusion in the damages award. Appellant's Brief at 37.

fifteen windows, and the full removal and replacement of windows in the living room and bedroom and of a long window for Homeowner's glass collection. Accordingly, the trial court reduced Homeowner's damages on her counterclaim from $32,931.30 to $29,867.55.

In March 2017, Contractor filed a notice of appeal. In April 2017, Homeowner also filed a notice of appeal. The trial court did not order the parties to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and neither party filed such a statement. In May 2017, this Court consolidated both appeals *sua sponte*.

Contractor raises three issues for our review:

I. Did the [trial] court err in reducing the hourly rate the Contractor noted in his invoices when the Homeowner did not dispute the hourly rate listed in all invoices and made thirteen (13) payments (over thirteen months) after receiving the initial invoice?

II. Did the [trial] court err in awarding damages when Homeowner's liability expert did not offer an opinion sufficient to establish that Contractor's work fell below the industry standard?

III. Did the [trial] court err in awarding damages when the proposed repair work of Homeowner's damages expert did not match what the Homeowner's liability expert indicated needed to be fixed?

Contractor's Brief, 578 MDA 217, at 4 (suggested answers omitted).

Homeowner raises four questions for our review:

A. Whether the trial court erred in determining that Appellee Bridget Glenn had no liability to [Homeowner]?

B. Whether the trial court erred in determining that [Homeowner] was not entitled to damages for the improper construction of a deck?

- 14 -

C.     Whether the trial court erred when it lowered the estimated cost of repairs to [Homeowner]'s house?

D.     Whether the trial court erred in dismissing and then refusing to permit reinstatement of [Homeowner]'s claim for damages under the [UTPCPL]?

Homeowner's Brief, 659 MDA 2017, at 4 (suggested answers omitted).

Our standard of review for non-jury trial verdicts is as follows:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law.  The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury.  We consider the evidence in a light most favorable to the verdict winner.  We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*Bank of N.Y. Mellon v. Bach*, 159 A.3d 16, 19 (Pa. Super.) (citation omitted), *appeal denied*, 170 A.3d 1019 (Pa. 2017).

**Contractor's Issues**

*Hourly Rate*

Contractor first contends that the trial court "committed an error of law by reducing the hourly rate under the facts involved in this action." Contractor's Brief, 578 MDA 2017, at 20.  Specifically, he argues that the trial court "erroneously reduced the agreed-upon hourly rate of $35.00 per hour to $16.00 per hour based upon" *Lytle, Campbell & Co. v. Sommers, Fitler*

*& Todd Co.*, 120 A. 409 (Pa. 1923). Contractor's Brief, 578 MDA 2017, at 20. He continues that "[w]aiting to dispute the hourly rate until litigation has commenced nearly two years after receiving the invoices constitutes laches which estops Homeowner from seeking an adjustment to the hourly rate." *Id.* at 25.

An award of compensatory damages will not be reduced or set aside by a reviewing court unless it is so grossly exorbitant, or so clearly and immoderately excessive, as to suggest unfairness, mistake, partiality, prejudice, or corruption and to shock the court's conscience or sense of justice. *Connolly v. Phila. Transp. Co.*, 216 A.2d 60, 64 (Pa. 1966); *City of Phila. v. Phila. Transp. Co.*, 162 A.2d 222 (Pa. 1960); *Flank v. Walker*, 157 A.2d 163, 171 (Pa. 1960).

> Only in an extreme case, where the amount of the verdict is clearly excessive, where it can be definitely said the [fact-finder] abused its discretion, should an appellate court reduce the verdict--and then only to bring the amount within the reasonable limitations of the facts and circumstances of that particular case.

*Huey v. Blue Ridge Transp. Co.*, 39 A.2d 602, 604 (Pa. 1944).

As noted by Contractor, the trial court relied on *Lytle*, 120 A. 409. In that case, the plaintiff-contractor agreed to perform some remodeling work for the defendant. *Id.* at 409. "Itemized statements were sent each week of the amounts paid the various workmen, and the cost of materials used. At the foot of each statement was a charge '10% overhead.'" *Id.* at 410. This calculation is similar to the one used in the Contract in the current case, which

included time, materials, and 10% profit.  In **Lytle**, **id.** at 410-11, the contractor contended that he was owed the "10% overhead" to recover the costs of insurance, rent, heat, light, taxes, and other expenses.  The Supreme Court of Pennsylvania disagreed and found in favor of the defendant, holding:

> The term 'time and material basis' was intended to include the necessary cost of operation affecting the particular undertaking, the cost of labor and materials that went into and became part of the finished product; each outlay thus expended must be included. To this there was to be added a profit of 10 per cent.  This latter item was intended to take care of that proportionate share of overhead charges included in the company's 'overhead,' or general expense, discussed above, as this contract related to plaintiff's general contracts, and, unless expressly written into the contract by defining exactly the overhead intended to be covered, the words 'time and material,' and like expressions, will not include overhead charges, but refer solely to the wages and salaries of the men engaged in the particular work contracted for and the actual cost of the materials furnished.

**Id.** at 411.  Our Supreme Court made clear in **Lytle** that, without an explicit agreement, Contractors may only recover overhead costs under the "10%" portion of the contract.

This Court expanded upon **Lytle** in **Wolfe v. Pickell**, 205 A.2d 634, 636 (Pa. Super. 1964), noting "[t]ime and materials contracts are contracts which provide for the payment to the contractor of the cost of his labor and materials, plus a percentage for his overhead and profit."  This Court elaborated that "time and material costs include **only** those that are direct operating charges which may be seen as the work progresses." **Id.** (emphasis added).

- 17 -

Here, allowing Contractor to charge whatever he wishes for the "time" portion of the Contract would be in direct conflict with **Lytle**. Contractor claims that the inflated hourly rate is necessary to recover the cost of his overhead expenses; however, the holding in **Lytle** states that such expenses are to be recovered under the "10% profit" portion of the Contract.

As the trial court explained: "If [Contractor] wished to charge more than that, the exact charge for time should have been inserted in the written agreement which he prepared and submitted to [Homeowner]. This was not done and thus [Contractor] should be limited in that charge to the $16.00 per hour rate." TCO, 3/6/17, at 2.

We also note that none of the cases cited by Contractor in his brief to this Court for this issue concern a construction contract or any contract listing specific amounts or rates for time, materials, and profit. **See** Contractor's Brief, 578 MDA 2017, at 24-27 (citing **Braun v. Wal-Mart Stores, Inc.**, 24 A.3d 875, 896 (Pa. Super. 2011) (citing **Schott v. Westinghouse Elec. Corp.**, 259 A.2d 443, 448 (Pa. 1969)); **In re Estate of Leitham**, 726 A.2d 1116, 1119 (Pa. Cmwlth. 1999); **Roznowski v. Pa. Nat'l Mut. Cas. Ins. Co.**, 493 A.2d 775 n.3 (Pa. Super. 1985) (citing **Fix's Estate**, 12 A.2d 826 (Pa. Super. 1940)); **Donahue v. City of Phila.**, 41 A.2d 879, 880-81 (Pa. Super. 1945) (citing **Robbins v. Weinstein**, 17 A.2d 629 (Pa. Super. 1941))).

As for Contractor's invocation of laches that allegedly estop Homeowner from seeking an adjustment to the hourly rate, Contractor's Brief, 578 MDA

2017, at 25, we note that the party asserting laches must establish: (I) that there was a delay arising from the complaining party's failure to exercise due diligence; and (II) that prejudice to the asserting party resulted from the delay. *Stilp v. Hafer*, 718 A.2d 290, 292 (Pa. 1988). Here, Homeowner did exercise due diligence, as she expressed her concerns about Contractor's charges while Contractor was still working on her home. Since Contractor's attempt to raise laches fails on the first prong, we need not address the second prong. *Id.*

*Sufficiency of the Evidence to Establish Contractor's Liability and Damages*

Contractor argues that the trial court "erroneously awarded Homeowner damages for repair when there was not sufficient evidence presented that Contractor's work fell below the industry standard." Contractor's Brief, 578 MDA 2017, at 27. Contractor notes that, "[o]n Homeowner's counterclaim for alleged poor workmanship, Homeowner had the burden of proving by a preponderance of the evidence that Contractor's work failed to meet the standard in the industry such that it constituted a breach of the contract." *Id.* at 28.

Contractor also contends that Homeowner's "experts do not state their opinions to a reasonable degree of certainty." Contractor's Brief, 578 MDA 2017, at 31. Contractor cites, *id.* at 30, to *Wiggins v. Synthes (U.S.A.)*, 29 A.3d 9 (Pa. Super. 2011), for the principle that "[e]xpert testimony must establish, to a reasonable degree of certainty, that an injury stemmed from

the alleged tortious conduct." *Id.* at 15 (citation omitted); *accord Labes v. New Jersey Transit Rail Operations*, 63 A.2d 1195, 1198 (Pa. Super. 2004). Contractor also references *Kravinsky v. Glover*, 396 A.2d 1349, 1356 (Pa. Super. 1979) (citations omitted): "An expert fails this standard of certainty if he testifies 'that the alleged cause 'possibly,' or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' 'that it caused the result.'" Contractor's Brief, 578 MDA 2017, at 31. Here, Contractor contends that Crane "does not opine with the required certainty that [Contractor] breached the applicable standard of care" and that the Hoover Estimate "simply gives estimates for performing certain work." *Id.*

Furthermore, Contractor challenges the inclusion of several of the projects in the damages award. Contractor's Brief, 578 MDA 2017, at 32-39.

Homeowner answers that the "trial court was correct in the measure of damages it awarded for work completed by [C]ontractor that was performed in an unworkmanlike manner and below the industry standard." Homeowner's Brief, 578 MDA 2017, at 22. Homeowner points to the myriad of specific problems with the home enumerated by Crane - including the leaking and improperly installed gutters and the improperly framed and mounted windows – as evidence that Contractor's performance was unworkmanlike and below the industry standard. *Id.* at 23-25 (citing N.T., 7/27/16, at 17-19, 45-48).

> Damages for a breach of contract should place the aggrieved party
> in as nearly as possible in the same position it would have

occupied had there been no breach. To that end, the aggrieved party may recover all damages, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

***Ely v. Susquehanna Aquacultures, Inc.***, 130 A.3d 6, 10 (Pa. Super. 2015)

(internal brackets, citations, and quotation marks omitted).

Here, the trial court awarded damages for seven broad areas of Homeowner's house: windows, crown molding, front stoop, staircase, front doors, garage door trim,[7] and gutters. Ex. Smith-22 at 1-2; TCO, 10/5/16, at 6-7. Homeowner's liability expert, Crane, provided abundant testimony that each of these areas fell below the industry standard and needed correction. Crane explicitly testified that his opinions were given with a reasonable degree of certainty within his industry – *i.e.*, the home inspection industry. N.T., 7/27/16, at 48-49. Moreover, Contractor offered no independent, expert evidence to counter Crane's assessment of the home and its construction. Furthermore, in the judgment of the trial court, Crane's testimony established that Contractor's work was not competent and did not meet applicable industry standards, and we cannot substitute our judgment for that of the

---

[7] As noted above, Contractor failed to challenge the inclusion of Item No. 10, the garage door trim, in the damages award. Appellant's Brief at 37. To the extent that we were to examine the evidence about the garage door trim, we would find that sufficient evidence was presented to support Contractor's liability. Ex. Smith-21 at 9, 21 ¶ 2.8; N. T., 7/27/16, at 32; TCO, 10/5/16, at 5. However, no evidence was presented as to whether the renovations proposed in the Hoover Estimate were necessary to place the garage door trim within the industry standard.

fact-finder. ***See Bank of N.Y. Mellon***, 159 A.3d at 19. Additionally, viewing all the evidence admitted at trial in the light most favorable to Homeowner as verdict winner, ***see id.***, the items that Crane found to be deficient reflected the original construction and the conditions that existed when the house was presented to Homeowner for occupancy. TCO, 10/5/16, at 6.

Examining each proposed project area individually, beginning with the windows, we note that Crane specifically stated that the problems with the windows occurred, because they were "not installed properly." N.T., 7/27/16, at 19. He focused on the rear bedroom window in particular. ***Id.*** at 22, 46, 48. The windows could only have been improperly mounted by Contractor – *i.e.*, these problems with Homeowner's house could not have been caused by anything besides sub-standard workmanship by Contractor. ***Id.*** at 45-49. Thus, there is sufficient evidence to establish that Contractor is liable for damages for the windows.

Homeowner's damages expert, Hoover, also testified that his opinions were given within a reasonable degree of certainty within his industry – *i.e.*, the construction industry. N. T., 7/28/16, p.m., at 33. However, no evidence was presented that the specific repairs to the windows that Homeowner had already made or that were enumerated in the Hoover Estimate were the best or correct choices or that they did not augment any windows, beyond what Contractor and Homeowner had originally agreed would be done.

Homeowner had already caulked all of the windows and removed and replaced a window in the living room. The Hoover Estimate also proposed replacing the casing on eleven windows, the entire window in the rear bedroom, and the entire long window displaying Homeowner's glass collection. Ex. Smith-22 at 1-2 ¶¶ 3, 7, 12. No testimony was presented that caulking and replacing casings would fix some of the windows. Furthermore, although Crane did testify about poor condition of the rear bedroom window, he could not recall what exact problems existed with the long display window, and he gave no testimony on the living room window, thereby making it impossible to determine whether the full replacement of these windows was or will be necessary. N.T., 7/27/16, at 22, 44, 46, 48. Moreover, Hoover testified that the back bedroom window may not need to be fully replaced, thus saving about $800. N.T., 7/28/16, p.m., at 35.

As for the other areas that the Hoover Estimate proposes repairing, Crane explicitly referred to the ceilings as "sub-standard," with the crown molding cracking, warping, and separating from the walls and ceilings. Ex. Smith-21 at 14; N.T., 7/27/16, at 38, 40. Crane also presents two possible methods of repairing these faults, but there was no testimony as to which (if either) method the Hoover Estimate was proposing nor why one particular course of repair was preferable to any other.

The front stoop was below the industry standard, because it was crumbling. *Id.* at 24. Nevertheless, Crane's report stated that the "[b]roken

stone should be repaired[,]" whereas the Hoover Estimate proposes removing the existing stone and replacing it. ***Compare*** Ex. Smith-21 at 8 ***with*** Ex. Smith-22 at 1 ¶ 5. We are uncertain why this discrepancy exists and if there is a valid reason why the stone should now be replaced instead of repaired.[8] Additionally, Hoover testified that the cost for Item No. 5 on the Hoover Estimate was from a third party, who did not testify, because Hoover did not plan to do the work himself. N.T., 7/28/16, p.m., at 22. Thus, no explanation or context was provided for this estimated cost to repair the front stoop. ***See id.***

Likewise, liability was established for the poor installation of the staircase and its railing, but no testimony was presented as to whether the Hoover Estimate's proposal to remove the entire existing staircase and to "reframe" it to a different part of the house is needed or if an alternative means of fixing the staircase and railing were available. N.T., 7/27/16, at 44-

---

[8] Contractor argues that Homeowner "failed to mitigate her damages" for the front stoop and "should not be permitted to 'upgrade' to thicker stone." Contractor's Brief, 578 MDA 2017, at 35. However, while Contractor is correct that a party injured under a breach of contract is under a duty to mitigate damages, "[t]he burden to prove this duty to mitigate is placed on the party who actually breaches the contract[.]" ***Portside Inv'rs, L.P. v. N. Ins. Co. of New York***, 41 A.3d 1, 15 (Pa. Super. 2011). Here, Contractor was found to have breached the contract; thus, the burden is on him to prove that Homeowner's reasonable efforts could have reduced the cost of the repairs to the front stoop. ***Id.*** Nevertheless, Contractor has failed to provide or to indicate any evidence that the new stone was of better quality, was more expensive, or was not peculiarly suited to correcting the problems with the stoop.

45; Exs. Smith-21 at 15-16, 23 ¶ 5.4 & Smith-22 at 1-2 ¶ 6. Crane did not recommend that the entire staircase be moved or that a passage be closed. Homeowner can only be compensated for necessary repairs. She cannot be reimbursed for enhancements to the original plan.

Additionally, Crane testified that the entry doors had "a poor fit and finish" and that remedial action was necessary, but there was no testimony that all of the actions planned in the Hoover Estimate – adjusting and re-aligning the doors, removing and replacing the exterior casings, and painting the new casings – are necessary to elevate the front doors to industry standards. N.T., 7/27/16, at 22-23; Exs. Smith-21 at 8 & Smith-22 at 2 ¶ 8. What is more, Hoover testified that he did not know how many hours would be involved in adjusting the door. N.T., 7/28/16, p.m., at 35.

Finally, the evidence was sufficient to establish that the installation of the gutters by Contractor was below industry standards, because they were improperly pitched and were fit with screws that were likely to corrode. N.T., 7/27/16, at 17-19. Crane opined that the repair of the gutters was required so that water did not pool in them instead of draining. *Id.* at 18-19; Ex. Smith-21 at 6, 20 ¶ 1.3 ("[g]utters will require repairs to function properly"). Nonetheless, no testimony was presented as to whether the specific repairs recommended in the Hoover Estimate – removing the zip screws, soldering the joints, and replacement of some portions of the gutters themselves – provide the best method to bring the gutters up to industry standards. Ex.

Smith-22 at 2 ¶ 14. Also, similar to the front stoop, Hoover testified that the cost for the gutters was from a third party, who did not testify and from whom no report was provided. N.T., 7/28/16, p.m., at 32-33. Hence, again, although the evidence supports the finding that some repair of the gutters is necessary, there was no clarification for why these exact repairs should be undertaken or how the cost was determined. *See id.* Furthermore, Hoover testified that he added "probably" ten percent to the third party's proposed figure, without any explanation as to why, besides that such an addition was "pretty standard." *Id.* at 37-38.

In general, for all the projects listed on the Hoover Estimate, Hoover testified that he did not separate any labor charge from materials. N.T., 7/28/16, p.m., at 34. He also did not have his notes with him at trial. *Id.* For these general reasons and for the specific reasons listed under each suggested repair, we conclude that Homeowner's damages were not proven with reasonable certainty nor that they would place her in as nearly as possible the same position she would have been in had Contractor built her home correctly and not breached the Contract. *See Ely*, 130 A.3d at 10.

Having determined that damages were not proven with reasonable certainty, we now consider whether a new trial on damages should be granted. In *Shiflett v. Lehigh Valley Health Network, Inc.*, 174 A.3d 1066 (Pa. Super. 2017), we explained:

> A court has discretion to hold a new trial solely on the issue of damages if: "(1) the issue of damages is not 'intertwined' with

the issue of liability, and (2) ... the issue of liability has been 'fairly determined.' " ***Mirabel v. Morales***, 57 A.3d 144, 152 (Pa. Super. 2012); ***see Kiser v. Schulte***, 538 Pa. 219, 648 A.2d 1, 7–8 (1994); ***Troncatti v. Smereczniak***, 428 Pa. 7, 235 A.2d 345, 346 (1967); ***Kraner v. Kraner***, 841 A.2d 141, 147 (Pa. Super. 2004); ***Lambert v. PBI Indus.***, 244 Pa.Super. 118, 366 A.2d 944, 955–57 (1976). "[L]iability is not intertwined with damages when the question of damages is readily separable from the issue of liability." ***Mirabel***, 57 A.3d at 152 n.8. The liability issue has been "fairly determined" when liability has been found "on clear proof" under circumstances that would not cause the verdict to be subject to doubt. ***Lambert***, 366 A.2d at 956. Here, we have resolved the issues raised by [defendant-appellant] Lehigh Valley [Health Network, Inc.,] regarding the propriety of the liability verdict regarding its corporate negligence, and it appears to us that the damages issue is readily separable from that liability issue. We therefore see no impediment to limiting the new trial to damages issues.

In this situation, a limited new trial is the preferred course. . . .

This Court has consistently held that where the only trial errors disclosed in the record deal with specific and discrete issues, the grant of a new trial should be limited to those issues. In ***Messer v. Beighley***, 409 Pa. 551, 187 A.2d 168 (1963), this Court held that where errors deal exclusively with damages, the new trial should be limited to damages. Likewise, in ***McKniff v. Wilson***, 404 Pa. 647, 172 A.2d 801 (1961), we held that since the only meritorious assignments of error involved damages, retrial should concern that issue alone.

***Id.*** at 1092–93 (some formatting).

Here, we have resolved the issues raised by Contractor regarding the propriety of the liability verdict, and the only meritorious assignments of error involve damages. ***See Shiflett***, 174 A.3d at 1093. Hence, the damages issue is readily separable from the issue of Contractor's liability, and we therefore see no impediment to limiting the new trial to damages issues. ***See id.***

In its original opinion, the trial court itself bemoaned the state of the evidence in this action, referring to it as "conflicting and at times incomplete." TCO, 10/5/16, at 2.[9]  Thus, in order to resolve all of these concerns so that damages may be proven with reasonable certainty and to complete the evidence in order to avoid the need for speculation by the trial court, we vacate the judgment and remand for a new hearing limited to the issue of damages.  **See Shiflett**, 174 A.3d at 1093; **Ely**, 130 A.3d at 10; **see also** TCO, 10/5/16, at 2.

## Homeowner's Issues

### *Bridget's Liability*

Homeowner first insists that the "trial court erred in determining" that Bridget "had no liability" to Homeowner.  Homeowner's Brief, 659 MDA 2017,

---

[9] The trial court's full comment was:

> In attempting to resolve the present litigation the [trial c]ourt has been confronted with various complexities which involved interpretation of the [Contract], [Contractor]'s performance, [Homeowner]'s making changes/additions after the dwelling was substantially completed, [Contractor]'s monthly billings which had almost no connection to the allowances called for in the agreement, [Homeowner]'s counterclaim for alleged workmanship defects and the use of inappropriate materials, and the parties entering into a post construction landscaping agreement.  All of these items were addressed with conflicting and at times incomplete evidence which was also at times not clearly understandable.  Against this background with . . . much time and effort, the [trial c]ourt has come to the ensuing Decision.

TCO, 10/5/16, at 2.

at 15. Homeowner argues that Bridget also does business as Larry Glenn Construction.

With respect to this challenge, after a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned analysis of the Honorable Carson V. Brown, we conclude that this claim merits no relief. The trial court opinion dated October 5, 2016, comprehensively discusses and properly disposes of this question:

> [Contractor] started his business in 1972 as a sole proprietor. He and [Bridget] were married in 1995 and sometime after that Bridget began doing office work for the business. There was no evidence that [Homeowner] had any contact with [Bridget] in the negotiating of the construction contract and the subsequent agreement to construct her home. After the home was entered into occupancy by [Homeowner], [Bridget] prepared a proposed agreement dated May 23, 2013 for [Homeowner] to sign for monthly payments on what [Contractor] claimed was the unpaid balance for the construction and the subsequent landscaping agreement. In preparing the agreement she indicated in the heading that the business was "Larry Glenn and his wife, Bridget Glenn, d/b/a Larry Glenn Construction." She also signed the agreement. [Homeowner] did not sign this agreement. [Homeowner] also presented evidence of [Contractor]'s business checking account where [Bridget] forged [Contractor]'s name on certain checks in paying medical insurance payments.
>
> [Contractor] denies that [Bridget] has any ownership interest in his business. [Homeowner]'s evidence does little more than establish that [Bridget] took a unilateral action claiming to be a part owner of [Contractor]'s business. No evidence has been presented showing any transaction between [Contractor] and [Bridget] vesting in her such an ownership interest. Her forging her husband's signature on certain business account checks was perhaps foolish, if not criminal, but it falls short of establishing that she held an ownership interest in the business. Accordingly, the [trial c]ourt [found] in favor of [Bridget] concluding that she has no liability with regard to the claims raised by [Homeowner].

TCO, 10/5/16, at 7. Consequently, with respect to the issue of Bridget's liability, as the findings of the trial court are supported by competent evidence, we affirm on the basis of the trial court opinion.

<u>Deck</u>

Next, Homeowner alleges that the trial court erred "in determining that [she] was not entitled to damages for the improper construction of a deck." Homeowner's Brief, 659 MDA 2017, at 22.

Here, the trial court stated that it did not award damages to Homeowner for the exterior deck, because the deck was not included in the Contract and was requested by Homeowner after the house was "substantially constructed." TCO, 10/5/16, at 6; **see also** TCO, 3/6/17, at 2 (the "outside deck" was "not done under the original agreement"). The deck could not be made a part of the structure of the house after it was built. TCO, 10/5/16, at 6. Contractor "in constructing it wanted to put support posts under the outer edges but [Homeowner] refused to have this done." **Id.** Consequently, the trial court concluded that Homeowner "was a participant in this problem." **Id.** Accordingly, the finding of the trial court that Homeowner was not entitled to damages for the cost of the deck was supported by competent evidence, and we will not reverse the trial court. **Bank of N.Y. Mellon**, 159 A.3d at 19.

<u>Damages</u>

Homeowner contends that "[t]he trial court erred when it lowered the estimated cost of repairs to [her] house." Homeowner's Brief, 659 MDA 2017,

at 28. As we are remanding for a hearing on damages, which may result in a different calculation of the damages award, we need not reach this issue.

<u>*Unfair Trade Practices and Consumer Protection Law*</u>

Finally, Homeowner suggests that the "trial court erred in dismissing and then refusing to permit reinstatement of [her] claim for damages" under the UTPCPL and "by failing to permit [Homeowner] to join [Bridget] related to those claims." Homeowner's Brief, 659 MDA 2017, at 30. She contends, in part, that she "proved that Contractor and Wife greatly inflated the costs under the contract" by charging an hourly rate of $35.00 for labor when Contractor only paid his employees $16.00 per hour, "a claim never addressed [in the preliminary objections] and one that falls squarely within Section 201-2(4)(xxi) of the UTPCPL." ***Id.*** at 36 (citing TCO, 3/6/17, at 1-4; TCO, 10/5/16, at 2-3).

This issue "involve[s] statutory interpretation, raise[s] a question of law, and [is] subject to *de novo* and plenary review." ***Krishnan v. Cutler Grp., Inc.***, 171 A.3d 856, 892 n.23 (Pa. Super. 2017) (citation omitted).

The UTPCPL makes unlawful certain unfair or deceptive acts or practices enumerated in 73 P.S. § 201-2(4) and creates a private cause of action for anyone who suffers an ascertainable loss as a result of these acts or practices. 73 P.S. §§ 201-3, 201-9.2(a). In her counterclaim against additional defendant, Homeowner alleges that Contractor and Bridget violated the UTPCPL by "[r]epresenting that . . . services are of a particular standard,

quality or grade, . . . [when] they are of another" and by "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," thereby violating § 201-2(4)(vii) and (xxi), respectively. Answer with New Matter & Countercl., 3/3/14, at ¶¶ 95-96.

However, in her brief to this Court, Homeowner does not cite to any evidence of misrepresentations made by Contractor or Bridget about the standard, quality, or grade of the Contractor's services. Homeowner's Brief, 659 MDA 2017, at 30-39.[10] Her bald allegations are insufficient to support a claim pursuant to 73 P.S. § 201-2(4)(vii).

For Section 201-2(4)(xxi), the "catchall" provision of the UTPCPL, plaintiffs must prove either common law fraud or deceptive conduct. *In re Strong*, 356 B.R. 121, 138 (Bkrtcy. E.D. Pa. 2004).[11] To establish either common law fraud or deceptive conduct, a plaintiff must establish an intent to mislead. *Krishnan*, 171 A.3d 856, 892 n.24 (elements of common law fraud include the intent to mislead another person); *Johnson v. MetLife*

---

[10] In her brief to this Court, Homeowner makes no explicit argument about 73 P.S. § 201-2(4)(vii). She only mentions this subsection in a procedural history of her UTPCPL claim. Homeowner's Brief at 31, 33 (included in counterclaim and complaint to join additional defendant, because Contractor and Bridget "provided work of a very poor quality after assuring [Homeowner] the work would be of good quality, in violation of 73 P.S. § 201-2(4)(vii)").

[11] "We may use decisions from other jurisdictions for guidance to the degree we find them useful and not incompatible with Pennsylvania law." *Newell v. Mont. W., Inc.*, 154 A.3d 819, 823 n.6 (Pa. Super. 2017) (citation and internal quotation marks omitted).

***Bank, N.A.***, 883 F.Supp.2d 542,548 (E.D. Pa. 2012) ("[d]eceptive conduct under [§ 201-2(4)(xxi)] is defined as intentional misleading by falsehood spoken or acted" (citations and internal quotation marks omitted)). Once again, Homeowner has failed to direct us to any evidence of Contractor's or Bridget's intent to mislead. Homeowner's Brief, 659 MDA 2017, at 30-39. Hence, Homeowner offers no evidence showing that Contractor or Bridget engaged in common law fraud or deceptive conduct either by their actions or their words. Homeowner therefore has not proven that the trial court erred in dismissing her UTPCPL claim pursuant to § 201-2(4)(xxi).[12]

In conclusion, we affirm Contractor's liability to Homeowner, that Bridget has no liability to Homeowner, and that Homeowner has no liability to Contractor, but we vacate the judgment and remand for a new hearing limited to the issue of damages.

Affirmed in part and vacated in part. Judgment vacated. Case remanded. Jurisdiction relinquished.

Judge Stabile joins the memorandum.

Judge Nichols files a concurring statement.

---

[12] As Homeowner failed to demonstrate in her brief that any evidence had been presented at trial to support a UTPCPL claim, we need not consider whether a properly established UTPCPL claim would still have been correctly dismissed by the trial court pursuant to the "gist of the action" doctrine. ***Knight***, 81 A.3d at 950; ***see*** Homeowner's Brief, 659 MDA 2017, at 31, 34, 36-37 n.5; Contractor's Brief, 659 MDA 2017, at 24-25; Order, 5/16/14, at 3, 5.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 06/25/2018